**In re MIRANT CORPORATION, et al., Debtors.**

**No. 03–46590.**

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Dec. 23, 2003.

Matthew Troy, U.S. Department of Justice, Civil Division, Washington, DC, for Defendant, Bonneville Power Administration (BPA).

Robin Phelan, Haynes and Boone, LLP, Dallas, TX, for Debtors.

## Memorandum Opinion

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the court is the Motion of the United States of America Pursuant to 11 U.S.C. § 362(d) and Rule 4001(a) of the Federal Rules of Bankruptcy Procedure for an Order Modifying the Automatic Stay Retroactively to Permit Termination of Confirmation Agreement (the "Relief Motion") filed by the United States on behalf of the Bonneville Power Administration (the "BPA"),[1] a unit of the Department of Energy. The Relief Motion was heard on December 17, 2003. Debtors[2] filed a response to the Relief Motion (the "Relief Response"), and both the Relief Motion and the Relief Response provided authorities and argument to the court. The court also has before it the transcript and record of its November 12, 2003, hearing on the Debtors' Contempt Motion (as hereafter defined), the court's Stay Order (as hereafter defined), certain correspondence and the affidavit of Cameron Bready ("Bready"), an officer of Mirant whom the BPA cross examined at the December 17 hearing.[3] The court also heard oral argument from the BPA, Debtors, and other parties in interest, both on December 17 and on November 12.[4]

This matter is subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(2)(G). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR.P. 7052 and 9014.

## I. Background

### A. Pre Bankruptcy

The Mirant Entities are an integrated group of companies engaged in the business of generation, sale, purchase and trading of various energy products. In the ordinary course of their business the Mirant Entities (at least through the participation of MAEM) are members of the Western Systems Power Pool ("WSPP") which coordinates distribution of power in the Pacific Northwest. Both the BPA and MAEM are signatory parties to the WSPP Agreement (the "WSPPA"), an umbrella agreement governing electric power sales and physical options within the WSPP.

1. The court will refer throughout this memorandum opinion to the BPA as the party seeking relief.

2. In the matter before the court, the Debtor involved is Mirant Americas Energy Marketing, L.P. ("MAEM"). The court will refer to MAEM sometimes as Debtor. When the term "Debtors" is used, the court refers to all Debtors in these administratively consolidated cases. "Mirant" refers to Mirant Corp., the lead Debtor and parent of all other "Mirant Entities," the latter term referring to both Debtors (including Mirant) and non-debtor direct and indirect subsidiaries of Mirant.

3. The BPA presented, but withdrew without offering, the affidavit of David Armstrong and other exhibits. Given the nature of the issues as the court defines them and the court's decision, the items presented by BPA, if now before the court, would not affect the result.

4. Though the two hearings addressed different motions, the argument on November 12 (as well as the briefs of Debtors, the BPA and other interested parties) addressed many of the same questions as were before the court on December 17.

The WSPPA, among other things, provides that each signatory is a forward contract merchant as that term is used in the Bankruptcy Code (see section 101(26) of the Bankruptcy Code (sometimes, the "Code"))[5] and is entitled to the protection of section 556 of the Code. The WSPPA also provides in section 22 that commencement of a case under the Bankruptcy Code is an event of default which allows other parties to the WSPPA to liquidate their positions vis-à-vis the bankrupt party (Relief Motion, pp. 3–4).

In 1999 MAEM's predecessor in interest[6] and the BPA entered into an Agreement to Enable Future Purchases, Sales and Exchanges of Power and other Services (the "Enabling Agreement") which provided a specific contractual mechanism for the two parties to engage in future transactions. The Enabling Agreement incorporates the terms of the WSPPA.

On November 17, 2000, pursuant to the Enabling Agreement, the BPA and MAEM executed the "Confirmation Agreement."[7] By the Confirmation Agreement, for $3,288,000 paid to MAEM, the BPA bought a three-year, one-time call option for power for the period 2004 through 2006. The option expires on December 23, 2003. At present, were the BPA to exercise the option, the purchase price of the power bought from MAEM would substantially exceed the market price for the power.

Apparently concerned by the deterioration in Debtors' financial condition by July of 2003, the BPA sent a letter on July 1 to MAEM requesting adequate assurance of MAEM's ability to perform under the Confirmation Agreement. On July 3, 2003, MAEM responded by letter and, on July 7, wired to the BPA $523,389 as adequate assurance of its ability to perform.

On July 14 and 15[8] Debtors filed petitions seeking relief under chapter 11 of the Code. Debtors remain in possession of their estates and are conducting their businesses in the ordinary course and pursuant to orders of the court. Two creditors' committees and a committee of equity owners have been appointed (section 1102

---

**5.** 11 U.S.C. §§ 101 *et seq.*

**6.** The Mirant Entities were spun off from the Southern Company on April 2, 2001. *See* Mirant Corporation Form 10–K, Notes to Consolidated Financial Statements December 31, 2002, 2001, 2000, p. F–7 *available at* http://www.mirant.com/financials/pdfs/G82217–N–0600.pdf (last visited December 22, 2003).

**7.** The BPA takes the position that the Confirmation Agreement, the Enabling Agreement and the WSPPA constitute a single contract. Debtors argue that, in fact, the Confirmation Agreement is no more than an option and so is not an executory contract. *See, e.g., In re Robert L. Helms Constr. & Dev. Co., Inc.,* 139 F.3d 702 (9th Cir.1998). The court assumes, without deciding, that the Confirmation Agreement is an executory contract. Also, without deciding whether the three agreements are a single contract (*see Nat'l Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 204 (2nd Cir.1989) (stating that two documents executed at the same time may be considered one agreement if the parties so intended); *In re Gardinier, Inc.,* 831 F.2d 974, 976 (11th Cir. 1987) (observing that the intention of the parties to a contract is the governing principle in contract construction); *Kopel v. Campanile (In re Kopel),* 232 B.R. 57, 65 (Bankr.E.D.N.Y. 1999) (stating that when several documents are construed as one contract the debtor must assume or reject them together)), the court assumes that the Confirmation Agreement incorporates the default terms of the Enabling Agreement and the WSPPA, including those terms relied on by the BPA in its arguments that MAEM is in default by reason of its bankruptcy filing and that the BPA is a forward contract merchant entitled to the protection of Code section 556.

**8.** Additional Mirant Entities have filed for chapter 11 relief since July 15, but their filings do not affect this matter.

of the Code) and are actively participating in the case.

## B. The Stay Violation

On July 30, 2003, the BPA sent a letter to MAEM terminating the Confirmation Agreement. In its July 30 letter, the BPA referred to its status as a "forward contract merchant" under the terms of the WSPPA and invoked Code section 556 as a basis for terminating the Confirmation Agreement by reason of MAEM's filing under the Code (July 30 letter, p. 1). The letter goes on to calculate that termination of the Confirmation Agreement gives rise to a "Termination Payment" of $1,085,040 due from MAEM to the BPA under the WSPPA (*id.*). The BPA finally indicates it will withhold payments due to MAEM of $552,014 leaving a purported balance due to the BPA from MAEM of $533,026 (*id.*). The BPA indicates upon payment of the latter amount it will return MAEM's adequate assurance payment of $523,389 (*id.*).

Following an exchange of letters between MAEM and the Justice Department lawyer representing the BPA, Debtors filed their Debtors' Motion to Enforce the Automatic Stay and for Contempt (the "Contempt Motion") on October 17, 2003. In the Contempt Motion and accompanying briefs, and at argument on November 12, Debtors argued that transmission of the July 30 letter violated the automatic stay of section 362(a) of the Code, specifically section 362(a)(3) (prohibiting acts to obtain or exercise control over property of the estate of a debtor) and 362(a)(7) (prohibiting offsets). Debtors argued that sections 556 [9] and 362(b)(6) [10] of the Code do not apply to the BPA. Those sections, Debtors maintained, only address actions by forward contract merchants. Because section 101(26) of the Code specifically defines a forward contract merchant as a "person," and because a governmental unit (which the BPA concedes it is) is not a "person" for purposes of section 101(26) (*see* definition of "person," section 101(41)

---

**9.** Section 556 states:

The contractual right of a commodity broker or forward contract merchant to cause the liquidation of a commodity contract, as defined in section 761 of this title, or forward contract because of a condition of the kind specified in section 365(e)(1) of this title, and the right to a variation or maintenance margin payment received from a trustee with respect to open commodity contracts or forward contracts, shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by the order of a court in any proceeding under this title. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a clearing organization or contract market or in a resolution of the governing board thereof and a right, whether or not evidenced in writing, arising under common law, under law merchant or by reason of normal business practice.

**10.** Section 362(b)(6) states:

(b) The filing of a petition under ... this title ... does not operate as a stay—

(6) under subsection (a) of this section, of the setoff by a commodity broker, forward contract merchant, stockbroker, financial institutions, or securities clearing agency of any mutual debt and claim under or in connection with commodity contracts, as defined in section 761 of this title, forward contracts, or securities contracts, as defined in section 741 of this title, that constitutes the setoff of a claim against the debtor for a margin payment, as defined in, section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, arising out of commodity contracts, forward contracts, or securities contracts against cash, securities, or other property held by or due from such commodity broker, forward contract merchant, stockbroker, financial institutions, or securities clearing agency to margin, guarantee, secure, or settle commodity contracts, forward contracts, or securities contracts....

of the Code), the BPA could not take advantage of sections 556 and 362(b)(6).

In its papers, the BPA responded that Congress would not have intended to exclude the BPA from the protections afforded forward contract merchants. In any event, the WSPPA, to which MAEM was a signatory, included a provision that all parties to it were "forward contract merchants" within the meaning of the Bankruptcy Code, and, therefore, the BPA argued MAEM is bound by the WSPPA and the BPA is entitled to forward contract merchant status.

Alternatively, the BPA argued that the Anti–Assignment Act, 41 U.S.C. § 15, bars assumption or assignment by MAEM of the Confirmation Agreement (and the Enabling Agreement). Anti–Assignment Act section 15(a) provides that no "contract . . . shall be transferred by the party to whom such contract . . . is given[,] to any other party, and any such transfer shall cause the annulment of the contract . . . , so far as the United States is concerned." Section 365(c)(1) of the Code limits the right of a trustee to assume or assign a contract as to which another party to the

contract is excused by "applicable law" from accepting performance from or rendering performance to "an entity other than the debtor or the debtor in possession." The BPA reasoned that 41 U.S.C. § 15(a) is applicable law of the sort meant in section 365(c)(1) of the Code. Turning to section 365(e)(2)(A)(i), which limits similarly section 365(e)(1)'s [11] invalidation of *ipso facto* clauses,[12] because the WSPPA contains an *ipso facto* default provision, and because the Confirmation Agreement (incorporating the *ipso facto* provision of the WSPPA) cannot be assumed or assigned by reason of 41 U.S.C. § 15(a), the BPA maintained that its July 30 letter terminating the Confirmation Agreement could not be a violation of the automatic stay. If, by law, MAEM cannot assume an agreement and an *ipso facto* default clause in the agreement is enforceable, then it cannot violate the stay to terminate an agreement which could never become part of the estate. *See Watts v. Pennsylvania Housing Finance Co. (In re Watts)*, 876 F.2d 1090 (3d Cir.1989); *Taylor v. United States (In re Taylor)*, 263 B.R. 139 (N.D.Ala.2001); *In re New Town Mall*, 17 B.R. 326 (Bankr.

---

**11.** Section 365(e)(1) and (2)(A)(i) read:

(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

(2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired

lease of the debtor, whether or not such contract or lease prohibits or restricts whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties. . . .

**12.** An *ipso facto* default clause is a contractual provision which operates automatically upon the bankruptcy or insolvency of a contract party. *Bruder v. Peaches Records & Tapes, Inc. (In re Peaches Records & Tapes, Inc.)*, 51 B.R. 583, 587 n. 6 (9th Cir. BAP 1985).

D.S.D.1982).[13]

Finally, the BPA urged that a contract which is not assumed would not be property of the estate. It insisted that governing precedent, *In re Tonry*, 724 F.2d 467 (5th Cir.1984), establishes the principle that a contract is not property of the estate of a debtor prior to its assumption.

In response to these arguments, Debtors countered that, by the plain language of the Bankruptcy Code, the BPA is a governmental unit, not a person. Thus it cannot be a forward contract merchant. Moreover, unlike the non-governmental dealers in forward contracts, the BPA does not face market-destructive risks from having to honor agreements with debtors—the concern of Congress in enacting sections 362(b)(6) and 556 being a domino effect if one insolvent forward contract merchant should impart its financial difficulties to its trading partners. As to the specific terms of the WSPPA, it is not possible for parties to an agreement, Debtors contended, to create for the BPA a status Congress did not give it under the Code.

Turning to the Anti–Assignment Act, Debtors cited a division in authority[14] as to whether 41 U.S.C. § 15(a) would constitute applicable law under section 365(c)(1) of the Code. Further, Debtors pointed to the specific reference in section 365(c)(1) to "the debtor or debtor in possession." This language, a 1984 amendment to the provision, is intended, in Debtors' view, to permit a *debtor* or *debtor in possession* (as opposed to a trustee) to assume and perform its own contracts regardless of a limit on assignability embodied in applicable law. Debtors then argued that this change in section 365(c)(1) would be effectively nullified if *ipso facto* clauses were enforceable under section 365(e)(2)(A)(i) against a debtor in possession.

Moreover, Debtors disagreed that, if the BPA could avoid assumption of the Confirmation Agreement by reason of sections 365(c)(1) and 365(e)(2)(A)(i), the BPA could terminate the Confirmation Agreement without first obtaining relief from stay. Instead, Debtors cited authority that relief from stay must be sought prior to terminating even a non-assumable contract. *See, e.g., Computer Communications, Inc. v. Codex Corp. (In re Computer Communi-*

---

**13.** These cases all involve agreements to make a loan and are governed by section 365(e)(2)(B). It is questionable whether the same considerations apply under both section 365(e)(2)(A) and section 365(e)(2)(B).

**14.** *See In re Am. Ship Bldg. Co., Inc.,* 164 B.R. 358 (Bankr.M.D.Fla.1994) (despite Anti–Assignment Act, which provides that no contract can be transferred by party to whom such contract is given to another party, debtor-in-possession had right to assume its prepetition, executory government contract to build ship, even though postpetition debtor in possession was not same entity as prepetition debtor that entered into the contract.), *In re Adana Mortgage Bankers, Inc.,* 12 B.R. 977 (Bankr. N.D.Ga.1980) (key to assignability of a United States government contract is whether the assignment is within the mischief Congress intended to prevent in enactment of 14 U.S.C. § 15, and if the contract is of the sort where

the government depends on certain characteristics or abilities of the contractor, the statutory prohibition will apply); *see also Thompson v. Comm'n,* 205 F.2d 73, 78 (3rd Cir.1953) (in applying interdiction of this section against transfer of Government contracts, court will not mechanically define "transfer" in terms of mere change of legal identity, but will pragmatically test each situation by extent to which change deprives Government of particular management and financial responsibility which rendered contractor a responsible bidder.); *contra In re TechDyn Sys. Corp.,* 235 B.R. 857 (Bankr.E.D.Va.1999) (where the Anti–Assignment Act prohibited assignment of debtor's government contracts, debtor, in its capacity as debtor-in-possession, was barred from assuming those contracts over the government's objection, even though debtor did not intend to assign them).

cations, Inc.), 824 F.2d 725, 730 (9th Cir. 1987) (stating that even if under section 365(c) an agreement cannot be assumed by the debtor, it may be terminated only after relief from automatic stay); *Calvin v. Siegal (In re Siegal),* 190 B.R. 639, 640 (Bankr.Ariz.1996); *In re Wegner Farms,* 49 B.R. 440, 444 (Bankr.N.D.Iowa 1985) (rejecting argument that right of termination "necessarily propels cancellation of [an agreement] outside the orbit of the automatic stay" and stating that when Congress intends to except certain types of contracts from the automatic stay Congress has done so).

As to the argument that *In re Tonry* establishes that an unassumed contract does not become property of the estate, Debtors noted *Tonry* has been subjected to criticism and not followed. *Computer Communications,* 824 F.2d at 729; *In re WRT Energy Corp.,* 202 B.R. 579, 582 (Bankr.W.D.La.1996); *In re Hutchins,* 216 B.R. 1 (Bankr.E.D.Ark.1997). They also point out that *Tonry* and other cases cited by the BPA are clearly distinguishable. *Tonry,* for example, involved a contingent fee agreement with a bankrupt attorney. Also, like other cases cited by the BPA, *Tonry* was a chapter 7 case.

## C. The Court's Determination of the Contempt Motion

■■■ At the conclusion of the November 12 hearing, the court ruled that the BPA had violated the automatic stay. For the stay to have no application, the BPA's conduct in sending the July 30 letter and applying amounts owed to MAEM to its

Termination Claim,[15] the BPA would have to have had the benefit of sections 362(b)(6) and 556 of the Code. Those exceptions to the automatic stay, however, are available only to forward contract merchants. As Debtors argued, to be a forward contract merchant, one must be a "person." Section 101(26) of the Code. A governmental entity is *not,* for purposes of section 101(26) of the Code, a person. This is the plain meaning of sections 101(26) and 101(41). The plain meaning of section 101(26) must be the basis for this court's construction of the definition of "forward contract merchant" and, by extension, of sections 362(b)(6) and 556 of the Code. *See Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (holding that where resolution of a question of law turns on a statute, courts must look first to the statutory language); *Union Bank v. Wolas,* 502 U.S. 151, 158, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991) (stating that the courts must give effect to a statute's plain meaning); *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (stating that where a statute's language is plain, the sole function of the courts is to enforce the statute according to its terms).

Indeed, the very fact that Congress established in section 101(41) certain instances where a governmental unit would be treated as a "person" but did not include among those the definition of forward contract merchant, clearly shows Congress knew how to give a governmental unit the status of a person when it thought appropriate.[16] The failure to include the status of

---

**15.** As discussed below, the "claim" of the BPA has a rather fictional character, representing notional as opposed to actual damages.

**16.** Section 101(41) reads:
    (41) "person" includes individual, partnership, and corporation, but does not include

governmental unit, except that a governmental unit that—
    (A) acquires an asset from a person—
    ( ) as a result of the operation of a loan guarantee agreement; or
    ( ) as receiver or liquidating agent of a person;

forward contract merchant in section 101(41)'s subsections that incorporate governmental units fortifies the court's conclusion that section 101(26) cannot include the BPA. A further indication of Congressional intent can be found in the use of the word "entity," which includes a governmental unit, in definitions which are parallel to that of "forward contract merchant." *See, e.g.,* Code sections 761(9) ("customer"), 761(12) ("foreign futures commission merchant"), 101(6) ("commodity broker" includes "foreign futures commission merchant") and 101(46) ("repo participant"). Congress knew how to incorporate governmental units such as the BPA into another defined term. The plain meaning of the statute thus specifically and unequivocally excludes the BPA from the protections and options granted to forward contract merchants by sections 362(b)(6) and 556 of the Code.

■ The court also concurs that parties to an agreement may not, by the terms of that agreement, alter the rights of a party in its ensuing bankruptcy case. Congress carefully crafted the Bankruptcy Code and especially the provisions relating to executory contracts to establish a balance that would at once preserve a debtor's estate and protect the parties with which the debtor has contracted. Even the rare cases that allow enforcement of a debtor's prepetition waiver of bankruptcy protections (none of which involves section 365) rely generally on the absence of other parties—creditors—who will suffer by reason of the debtor's loss. *See, e.g., In re*

*Shady Grove Tech Center Assocs. Ltd. P'ship,* 216 B.R. 386, 393–94 (Bankr.D.Md. 1998), *In re Darrell Creek Assocs., L.P.,* 187 B.R. 908, 913–14 (Bankr.D.S.C.1995); *In re Cheeks,* 167 B.R. 817, 818–19 (Bankr. D.S.C.1994). *Contra In re Pease,* 195 B.R. 431, 432 (Bankr.D.Neb.1996). In the case at bar, many others have an interest in Debtors' estates, including creditors having more than $11,000,000,000 in claims.

■ As to the BPA's argument that section 365(e)(2)(A) left it free to terminate the Confirmation Agreement,[17] this court shares the view of those courts that hold, even if a contract is unassumable and contains a valid *ipso facto* clause, the stay *still* applies to prevent unilateral termination and must be modified before the *ipso facto* clause (or similar default) may be invoked. *See Computer Communications,* 824 F.2d at 729–30 (holding that even if section 365(e)(2) allowed the non-debtor party to terminate a contract, section 362 automatically stayed unilateral termination of the contract); *cf. In re Minoco Group of Cos., Ltd.,* 799 F.2d 517, 519 (9th Cir.1986) (stating that the right to cancel an insurance policy is stayed under section 362(a)(3)) (*citing A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1001 (4th Cir.1986)); 3 COLLIER ON BANKRUPTCY ¶ 365.06[1][f][i] 15th ed. rev.2000.

■ The instant case starkly demonstrates why the court must first pass on relief from stay before a party invokes an *ipso facto* clause pursuant to section

---

(A) is a guarantor of a pension benefit payable by or on behalf of the debtor or an affiliate of the debtor; or
(A) is the legal or beneficial owner of an asset of
    ( ) an employee pension benefit plan that is a governmental plan, as defined in section 414(d) of the Internal Revenue Code of 1986; or

    ( ) an eligible deferred compensation plan, as defined in section 457(b) of the Internal Revenue Code of 1986;
shall be considered, for purposes of section 1102 of this title, to be a person with respect to such asset or such benefit . . .

17. Apparently the BPA adopted this argument as an afterthought, as it is not cited in the July 30 termination letter.

365(e)(2)(A). As noted above, it is not at all clear that the Anti–Assignment Act limits assumption of contracts in chapter 11. The question of whether such a clause is effective is one for determination by a court, not a party to the contract wishing to rely on the debtor's bankruptcy as a default. As this court had occasion to note recently in a much smaller case, involving a creditor certainly less sophisticated than the BPA and, if not less well, surely less massively represented: "It is not up to a party exercising a self-help remedy to determine, to the preclusion of this court, what is or is not property of the estate." *Chesnut v. Brown (In re Chesnut),* 300 B.R. 880, 887 (Bankr.N.D.Tex.2003).

The point made in *Chesnut* also is applicable, in the court's view, to the BPA's reliance on *Tonry* and similar cases.[18] The BPA cannot have been unaware that courts regularly treat debtors' contracts as property of the estate prior to their assumption. *See, e.g., Computer Communications,* 824 F.2d at 729–30; *Minoco,* 799 F.2d at 519; *A.H. Robins,* 788 F.2d at 1001. Moreover, *Tonry* relied on an early, now out-dated version of COLLIER ON BANKRUPTCY in opining that a contract must first be assumed to be estate property. 724 F.2d at 469. The language cited in *Tonry* has been deleted, and, as noted above, COLLIER currently is of the view that the stay prevents termination of a contract containing an enforceable *ipso facto* clause. 3 COLLIER ON BANKRUPTCY ¶ 365.06[1][f][i] 15th ed. rev.2000.

■ Furthermore, there is overwhelming authority to the effect that other parties to a contract with the debtor must perform under a contract with the debtor prior to the debtor's decision to assume or reject. *In re Pub. Serv. Co. of New Hampshire,* 884 F.2d 11, 14 (1st Cir.1989) (stating that creditors are bound to honor executory contracts until the debtor commits itself to assumption or rejection); *In re El Paso Refinery, L.P.,* 220 B.R. 37, 44 (Bankr.W.D.Tex.1998) (stating that the non-debtor must perform until assumption or rejection of an executory contract); *In re BCE West, L.P.,* 257 B.R. 304, 307 (Bankr.D.Ariz.2000) (noting that executory contracts may, generally, be enforced by but not against a debtor prior to assumption); *see also, Bordewieck, The Postpetition, Pre–Rejection, Pre–Assumption Status of an Executory Contract,* 59 Am. Bankr.L.J. 197, 200 (1985) ("[D]uring the period from the date of filing until the date on which the DIP rejects or assumes an executory contract, the non-debtor party is bound to perform . . ."). These authorities are inconsistent with the proposition that assumption is necessary before the estate can have a property interest in a contract. Thus, the court concludes that, even if a contract is not property of the estate until assumption, a debtor has rights under the contract which *are* property of the estate and so are protected by the automatic stay from actions of other parties.

For the foregoing reasons, at the conclusion of the November 12 hearing[19] the court determined that the BPA had violated the automatic stay of section 362 of the Bankruptcy Code. As a result, the court entered its Order Granting Debtor's Motion to Enforce the Automatic Stay Against the Bonneville Power Administration and for Contempt (the "Stay Order").

---

**18.** The BPA's *Tonry* argument also apparently was discovered after the BPA terminated the Confirmation Agreement.

**19.** The November 12 hearing was adjourned by the court because of time constraints. The court offered the BPA the option of continued proceedings on the Contempt Motion, but the BPA instead elected (the court understood) to accept the court's ruling and unravel its postpetition actions.

The Stay Order was presented to the court as an agreed order and was signed by counsel for both MAEM and the BPA. The court is advised, however, that the BPA has noticed an appeal of the Stay Order.

## D. The Relief Motion

As a result of the Stay Order, the BPA revoked its termination of the Confirmation Agreement. It then filed the Relief Motion and requested that the court give the Relief Motion expedited consideration. The BPA explained the need for expedited consideration of the Relief Motion on the basis of the December 23, 2003 date by which it was required to exercise its one-time option under the Confirmation Agreement.

At the December 17 hearing on the Relief Motion, Bready testified that MAEM could unquestionably perform under the Confirmation Agreement. He also testified that, were the market price for power higher than the price guaranteed the BPA by the Confirmation Agreement, it was likely Debtor would reject the Confirmation Agreement to avoid the loss which would be incurred through performance.

It is in this testimony and the peculiar facts surrounding the Enabling Agreement and the Confirmation Agreement that the real reason for the parties' dispute may be unearthed. The BPA is struggling mightily to terminate a contract (or option) both parties acknowledge would never actually be performed. Debtors are struggling mightily to preserve that contract until after December 23, 2003. If the BPA succeeds in declaring a default and terminating the Confirmation Agreement, pursuant to section 22 of the WSPPA MAEM's "default" will entitle the BPA to a Termination Payment, which, in turn, will give the BPA a claim against MAEM in these chapter 11 cases of approximately $1,000,000. If Debtors prevail, and MAEM is not declared in default, there will be no claim, and the BPA will, instead, be liable to MAEM for a similar amount.

The BPA premises its Relief Motion upon its purported right to declare the Confirmation Agreement in default by reason of the *ipso facto* clause. The BPA asserts that "cause" exists within the meaning of section 362(d)(1) for the court to grant relief from the stay. The BPA argues that, if the stay is not modified in its favor, it will lose the benefit of the *ipso facto* clause, which it maintains it is entitled to for the reasons discussed above.

More persuasively, the BPA argues that MAEM would have an unfair advantage under the law if the Confirmation Agreement, the Enabling Agreement and the WSPPA were subject to assumption or rejection under section 365 of the Code and the BPA were prevented from terminating them. This argument is based on the assumption that such an interpretation of the law leaves a debtor in a win-win situation. If the debtor is committed to sell below market, it will always reject a contract; if the price is above, it will assume a contract. The BPA suggests that reading the Bankruptcy Code to arrive at such a result in the context of the WSPP (a result which would not apply to persons who are forward contract merchants within the meaning of Code section 101(26)) could not be correct. The BPA points out that a debtor, given such a reading of the law, has no risk under a contract like the Confirmation Agreement, possibly deferring to the last minute a decision whether or not to assume and so perform. The BPA urges that such a situation would create dangerous uncertainty concerning its power supply and would require it—and other parties relying on the WSPPA—to reassess and revise risk policies.

## II. Issue

Before stating the precise questions the court will address, the court specifically finds that MAEM was and is ready, willing and able to perform all its obligations to the BPA under the Confirmation Agreement. The court further finds that, had the Confirmation Agreement been economically disadvantageous to Debtors, and assuming it is an executory contract, Debtors would have sought to reject it pursuant to Code section 365(a). Finally, the court assumes, but does not find,[20] that a motion by Debtors to reject a contract like the Confirmation Agreement under such economic circumstances would be granted.

The issues, then, that the court will address are:

1. Does the BPA's potential loss of the benefit of the *ipso facto* clause constitute cause for modifying the automatic stay?

2. Is the BPA entitled, pursuant to section 365(e)(2)(A), to declare MAEM in default under the Confirmation Agreement by reason of MAEM's chapter 11 filing?[21]

## III. Discussion

### A. Loss of the Use of the *Ipso Facto* Clause is Not Cause Under Section 362(d)(1) for Relief From Stay.[22]

██ Other than the absence of adequate protection, section 362(d)(1) does not provide guidance as to what constitutes "cause" which justifies relief from the automatic stay. A leading treatise cites showings such as bad faith commencement of the bankruptcy case, wrongdoing by the debtor, potential delay of a multiparty trial, lack of harm to the estate, as with fully insured claims, and similar "causes." 3 COLLIER ON BANKRUPTCY ¶ 362.07[3][a], 15th ed. rev.2002; *see similarly* 2 NORTON BANKRUPTCY LAW AND PRACTICE 2d § 36:34, 2001. This suggests that a finding of "cause" is dependent on facts demonstrating wrongful conduct by the debtor, absence of harm or cost to the estate, potential of harm to other parties or abuse of the bankruptcy system.

The only potentially legitimate "cause" shown by the BPA in the instant case would be the possible abuse by Debtors of section 365 of the Code. As discussed above, the BPA argues that the right of a debtor to choose whether or not to assume a contract puts a party like the BPA at an unfair disadvantage and gives to a debtor the ability to ensure it will be bound by (i.e., assume) only profitable contracts.

To begin with, it is by no means clear that this was not exactly what Congress had in mind when it enacted section 365. There is substantial authority for the proposition that section 365 was intended to allow a trustee or debtor in possession to eliminate burdensome, unprofitable contracts and preserve for the estate's benefit

---

20. *See Mirant Corp. v. Potomac Electric Power Co. (In re Mirant Corp.),* 299 B.R. 152, 166 (Bankr.N.D.Tex.2003), noting that a debtor may be required by the court to meet other than the business judgment standard in order to reject a contract.

21. Given that the court decides the first question in the negative, it need not, strictly speaking, reach the second. However, the focus of most of the argument of the parties has been on the second issue, and, in order to avoid

potential multiplicity of proceedings, the court will address it.

22. Though the burden of proving the absence of cause is on Debtors (section 362(g)(2)), the BPA has the burden of going forward and establishing a "cause" which Debtors must then disprove. In this case the court concludes the BPA has not stated a "cause" that would satisfy the requirement of section 362(d)(1).

valuable agreements. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (stating that rejection of an executory contract can release the estate from burdensome obligations that can impede a successful reorganization); *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2nd Cir.1993) (in reviewing a trustee's or debtor in possession's decision whether to assume, bankruptcy courts determine whether a contract will be beneficial or burdensome to the estate); *In re Sudbury, Inc.*, 153 B.R. 776, 778 (Bankr.N.D.Ohio 1993) (stating that section 365 is designed to give the trustee the option of assuming contracts where performance by a third party will benefit the estate or to forego the third party's performance where the benefit to the estate will be less than the cost).

As to the dilemma posited by the BPA, that it faces uncertainty as to whether power it has optioned for the future will be provided if Debtors are able to elect assumption or rejection of contracts like the Confirmation Agreement based on current market conditions, Congress has provided remedies other than relief from the stay. Section 365(d)(2) of the Code allows a party to a contract with a debtor to ask the court to force a decision as to assumption or rejection. If the BPA approached the court with a showing that certainty of its power supply required Debtor promptly to make such an election, the court would likely grant such relief.

The BPA, however, insists this is not enough. Suppose, it argues, a debtor assumes a contract like the Confirmation Agreement and then cannot perform. Aside from the risk in any contract of nonperformance by a party, the BPA overlooks the provisions of section 365(b), which condition assumption of a contract on cure and on "adequate assurance of future performance...."

Moreover, the problem the BPA cites is no more than hypothetical. The BPA does not seek relief from stay to stabilize its future supply of power. The BPA wants relief from stay so that it may declare a default that will give rise to a claim against MAEM. That claim would not result from damage or loss to the BPA. It would exist solely because the BPA was able to take advantage of MAEM's chapter 11 filing to create it. Assisting the BPA in obtaining such a windfall would not be giving effect to the intent of Congress in enacting section 362(d)(1) and would be inconsistent with the numerous expressions by Congress that a bankruptcy filing should not adversely affect the conduct of a debtor's business. *See, e.g.*, Bankruptcy Code sections 365(e)(1), 525(a),[23] 541(c) and 1124(2)(A).

The court does not hold today that default under a contract by a debtor will never constitute cause under section 362(d)(1) for relief from the automatic stay. A default may truly put a party who has contracted with the debtor in peril. A debtor may abuse the bankruptcy system

---

**23.** The court cannot help but wonder whether the position of the BPA is not inconsistent with the obligations imposed upon it, as an agency of the government, by section 525(a). This provision is but one more indication that Congress fully intended that, in a case such as that at bar, agencies of the United States should continue to be bound by contracts with a debtor which private entities might terminate. *Cf. FCC v. Nextwave Personal Communications, Inc.*, 537 U.S. 293, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003). Indeed, the trial court in *Nextwave* recognized the parallel between the situation there presented and enforcement by the government of an *ipso facto* clause pursuant to section 365 of the Code. *In re NextWave Personal Communications, Inc.*, 244 B.R. 253, 269 (Bankr. S.D.N.Y.2000).

merely to avoid the ramifications of non-performance of a contract. Such a case is not before the court. Today the court holds that the desire of a party to declare an *ipso facto* default in order to obtain a windfall profit at the expense of the debtor and its creditors is not cause for relief from the stay.

## B. Sections 365(c)(1) and 365(e)(2)(A) Do Not Apply to the *Ipso Facto* Clause in the WSPPA

■ In the preceding section of this memorandum opinion the court rejects the BPA's argument that its future plans for acquiring power could be held hostage by the election to assume or reject available to MAEM under section 365(a) of the Code. In its reasoning the court tacitly assumes the *ipso facto* clause in the WSPPA was not available to allow *MAEM* to avoid assumption of the Confirmation Agreement. While the court, as discussed below, concludes that the clause at issue does not prevent MAEM's assumption of the Confirmation Agreement, even were a valid and enforceable *ipso facto* clause at issue, it could not be used to benefit Debtor. Sections 365(c)(1)(B) and 365(e)(2)(A)(ii) leave in the hands of the other party to a contract the decision of whether an *ipso facto* will be invoked to bar assumption of the contract. Thus, a debtor itself may not use an *ipso facto* clause to prolong the uncertainty of whether it can and will perform an agreement in the future, since, put to the election to assume or reject, the debtor, if it assumes with the other party's consent, is bound.

■ As to the enforceability of the clause here at issue, the division in the courts over the question of whether the Anti–Assignment Act is "applicable law" of the sort that would validate an *ipso facto* clause under section 365(e)(2)(A) has already been mentioned. This court shares the view that the Anti–Assignment Act does not prevent assumption of an agreement under section 365(c)(1) and, hence, does not allow enforcement of an *ipso facto* clause pursuant to section 365(e)(2)(A).[24] The focus of the act is on assurance that the government will receive the performance for which it bargained. *See Thompson*, 205 F.2d at 77–78. That inquiry is a mandated part of the process of assuming any contract. It is through the assumption process that the government is protected.

The court also shares Debtors' view that it would be absurd to exclude automatically from the estate every contract with the United States—presumably from the Confirmation Agreement to an agreement for maintaining and servicing vending machines at a government facility. Where, as here, the performing party does not change and there is no doubt about its ability to perform,[25] the purposes of the Anti–Assignment Act are not served by preventing MAEM from assuming the Confirmation Agreement. There are simply too many agreements involving debtors under the Code to which the national government, in one capacity or another, is a signatory to give the Anti–Assignment Act the broad scope suggested by the BPA.

Even assuming that the Anti–Assignment Act is "applicable law" within the

---

**24.** Put another way, as the Anti–Assignment Act is not "applicable law" within the meaning of section 365(c)(1), a contract such as the Confirmation Agreement is subject to being dealt with as provided in section 365(a) and is not one as to which the provisions of section 365(e)(2)(A) would apply.

**25.** Debtors presently hold approximately $1,700,000,000 in cash. This furnishes conclusive support for Bready's testimony that MAEM could readily perform.

meaning of sections 365(c)(1) and 365(e)(2)(A), the court concludes that the *ipso facto* clause in the WSPPA may not be enforced as an event of default. The statute plainly permits a debtor or debtor in possession to assume a contract whether or not applicable law excuses other parties from accepting performance from or providing performance to an entity other than the debtor.

In 1984 Congress amended section 365(c)(1)(A) of the Code. Previously, that provision read "[t]he trustee may not assume . . . an executory contract, if—(1)(A) applicable law excuses a party, other than the debtor, to such contract from accepting performance from or rendering performance to the trustee. . . ." The 1984 amendments substituted for the words "the trustee," "an entity other than the debtor or the debtor in possession." This change in language was designed to permit assumption of contracts (if the requisite tests for assumption in section 365(b) were met) when the same entity with which the nondebtor party had contracted was the one to or from which performance would occur post-petition. *See Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 493 (1st Cir.1997); *In re Cardinal Indus., Inc.*, 116 B.R. 964, 981–82 (Bankr.S.D.Ohio 1990); *In re Ontario Locomotive & Indus. Ry. Supplies, Inc.*, 126 B.R. 146, 148 (Bankr.W.D.N.Y.1991).

The *Cardinal* court carefully analyzed the congressional intent in modifying section 365(c)(1). The *Cardinal* court concluded

> that Congress did not intend § 365(c)(1) to preclude assumption of an otherwise nonassignable personal service contract if the performance . . . will be the same as if no petition had been filed. Rather, . . . a debtor in possession can assume a personal service contract that is nonassignable . . . as long as its performance is going to be the same as if no petition had been filed . . .

■ *Cardinal*, 116 B.R. at 979.[26] While the court need not reach the precise issue faced in *Cardinal*—whether the *trustee* could assume a contract which the *debtor* would then perform, the court is persuaded that the *Cardinal* court's analysis of congressional intent in amending the section is correct. This conclusion is fortified by the rare specific reference in the 1984 amendment to the "debtor in possession." Though the debtor in possession is the key player in chapter 11 (and chapter 12), references to the debtor in possession, as opposed to the trustee or the debtor, are unusual in chapters III and V of the Code. The specific use of the words "the debtor or the debtor in possession" leads the court to conclude that a contract to be performed by a debtor or debtor in possession (as opposed to a trustee) is subject to assumption whether or not applicable law limits its assignability and whether or not the contract includes an *ipso facto* clause.

■ In turn, this requires the conclusion that section 365(e)(2)(A) does not permit invocation of an *ipso facto* clause as a default unless assumption by the trustee— versus the debtor or debtor in possession—is contemplated.[27] To view section 365(e)(2)(A) as leaving a party the option of enforcing an *ipso facto* default clause

---

**26.** The *Cardinal* analysis is approved—and the contrary view criticized—by a leading treatise. *See* 3 COLLIER ON BANKRUPTCY ¶ 365.06[1][d] 15th ed. rev.2000.

**27.** The ability of a debtor or debtor in possession to assume a contract containing a bankruptcy default provision enforceable against a trustee provides additional reason for requiring a party to obtain relief from the automatic stay before terminating a contract on the authority of such a provision.

even if the contract at issue is to be assumed and performed by the debtor or debtor in possession would render the 1984 amendment to section 365(c)(1) virtually meaningless.[28] A debtor would, effectively, be forced to cure an *ipso facto* clause default in order to assume a contract fitting within the scope of amended section 365(c)(1).

Moreover, Congress did not *need* to amend section 365(e)(2)(A) to conform to the new language of section 365(c)(1). Though a debtor in possession is often equated with a trustee, the two are not the same. It is pursuant to section 1107(a) of the Code that the debtor in possession is empowered as an estate representative in lieu of a trustee. Section 1107(a) provides in pertinent part that "[s]ubject to any limitations on a trustee ... a debtor in possession shall have all the rights ... and powers, and shall perform all the functions and duties ... of a trustee serving in a case under this chapter." While section 365(c)(1) provides a limit on the trustee's rights and powers, and so had to be amended to except from that limitation debtors and debtors in possession, section 365(e) does not grant a power, right, duty or function to the trustee and, therefore, section 365(e)(2)(A) does not limit a power, right, duty or function of the trustee and, by extension, the debtor in possession. Thus, there was no need for Congress to differentiate between a trustee and the debtor in possession in that provision.

 Finally, the court considers it improbable that the limitations on assumability of contracts under sections 365(c)(1) and 365(e)(2)(A) were meant as offensive weapons to be used against a debtor, an estate and their creditors. Just as the automatic stay has often been described as a shield, not a sword (*see, e.g., Winters v. George Mason Bank,* 94 F.3d 130, 136 (4th Cir.1996); *In re Edgins,* 36 B.R. 480, 484 (9th Cir. BAP 1984)), so, too, sections 365(c)(1) and 365(e)(2)(A) are intended to protect contract parties from enforced acceptance of inadequate performance. These provisions of the Code are not meant to aid creditors in penalizing an estate.

For the foregoing reasons the court holds that the *ipso facto* clause relied upon by the BPA is unenforceable against MAEM. Therefore, the BPA cannot rely on the *ipso facto* clause as a default. Absent a showing of a default, and absent any showing that, even if a default existed, it would cause harm to the BPA, the BPA has failed to carry its burden of showing cause for relief from the stay to terminate the Confirmation Agreement.[29]

## IV. Conclusion

For the foregoing reasons, the court must reject the Relief Motion. A separate order will be entered to this effect.

---

**28.** The legislative history accompanying the Bankruptcy Reform Act of 1978 (i.e., the Code) provides no guidance as to congressional intent in enacting section 365(e)(2)(A), which suggests that it complements section 365(c)(1) (which is treated in the Senate and House Reports). Rather section 365(e) is discussed in terms only of *avoidance* of *ipso facto* clauses. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 348–49 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6304–06; S.Rep. No.

989, 95th Cong., 2d Sess. 59 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5845.

**29.** The court notes that the effect of its decision does not alter the ability of forward contract merchants to cease doing business with Debtors. They may enforce their rights under sections 62(b)(6) and 556 and have no need to rely on section 365(c)(1) and 365(e)(2)(A) to terminate agreements with Debtors.