In re MIRANT CORPORATION, et al., Debtors.

Mirant Americas Energy Marketing, L.P., Plaintiff,

v.

Kern Oil & Refining Co., Defendant.

Bankruptcy No. 03–46590–DML–11. Adversary No. 04–4040.

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

May 17, 2004.

Craig H. Averch, White & Case, LLP, Los Angeles, CA, Thomas E. Lauria, White & Case, LLP, Miami, FL, Robin Phelan, Judith Elkin, Haynes & Boone, LLP, Dallas, TX, Jeff P. Prostok, Blake Berryman, Forshey & Prostok, LLP, Fort Worth, TX, for Debtors.

Rick L. Shackelford, Jones Day, Los Angeles, CA, H. Joseph Acosta, Jones Day, Dallas, TX, Michelle Morgan Harner, Jones Day, Chicago, IL, for Defendant.

## MEMORANDUM OPINION

DENNIS MICHAEL LYNN,
Bankruptcy Judge.

Before the court is Plaintiff's Motion for Partial Summary Judgment (the "Motion") filed in the captioned adversary proceeding (the "Adversary") by Mirant Americas Energy Marketing, L.P. ("Plaintiff" or "MAEM") and the Cross–Motion for Partial Summary Judgment (the "Cross MSJ") made by Kern Oil & Refining Co. ("Defendant" or "Kern").[1] Plaintiff filed its Brief in Support of Plaintiff's Motion for Partial Summary Judgment (the "MAEM Brief"). Kern has filed its Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment (the "Kern Brief") to which Plaintiff filed a reply (the "MAEM Reply").

Plaintiff submitted affidavits made by Dr. Cindy Ma ("Ma"),[2] and John Hogan ("Hogan"; the "Hogan Affidavit"), Director of Gas and Fuel Procurement for Mirant Corporation ("Mirant"), and certain contracts, other documents and pleadings filed in these chapter 11 cases (the "MAEM Summary Judgment Evidence"), which will be identified and described as appropriate below. Defendant filed with the court an affidavit made by Alan Kornicks ("Kornicks"; the "Kornicks Affidavit"), Kern's Vice President. Defendant also requested that the court take judicial notice of Rule 35, Southern California Gas Company Rules (the "SoCal Rules")[3] and certain briefs filed in the United States Court of Appeals for the Fifth Circuit in unrelated but precedentially relevant cases. At the hearing held on the Motion on March 24, 2004 (the "March Hearing"), the court granted Defendant's request (the items thus admitted, together with the Kornicks Affidavit and its attachments, are hereinafter referred to as the "Kern Summary Judgment Evidence," which, together with the MAEM Summary Judgment Evidence, constitutes the "Summary Judgment Evidence").

The parties argued their initial positions at the March Hearing. Thereafter, the court determined further argument respecting the effect on the Adversary of certain of its orders would be useful. By letter dated April 19, 2004, the court posed several questions to the parties. The court heard additional argument on those questions on April 21, 2004 (the "April Hearing"). During the April Hearing, with the agreement of the parties, the court supplemented the record with additional filings from these chapter 11 cases.

The Adversary is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (M) and (O). It is therefore subject to this court's jurisdiction in that it involves disposition of the underlying chapter 11 case and matters "arising under title 11, or arising in ... cases under title 11." 28 U.S.C. § 1334(b). This Memorandum Opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR.P. 7052.

---

1.. The Cross MSJ is made through Kern's request in note 3, p. 4 of the Kern Brief (as hereinafter defined) that the Kern Brief be so considered.

2. For reasons stated below, the court determined that, for purposes of deciding the Motion, Ma's testimony would not be helpful.

3. The SoCal Rules are available at <http://www.socalgas.com/regulatory/tariffs/tariffs—rules.shtml> (last visited May 10, 2004). As discussed below, the court has reviewed the SoCal Rules in their entirety.

## I. *Background*

Resolution of the Adversary depends on whether the Bankruptcy Code[4] or certain orders of this court (or both) provided to Kern the ability to offset against amounts owed to MAEM damages Kern would suffer by reason of termination of MAEM's status as Kern's supplier of natural gas. If Kern was entitled by law to protect itself, the Adversary also questions whether Kern acted beyond the law's permit. The Motion and Cross MSJ require that the court determine whether or not, based on undisputed facts, Kern's rights (or lack thereof) are essentially clear as a matter of law. In order to do so, the court must first establish the context in which the Motion and Cross MSJ are presented.

### A. *Prepetition Relationship between Kern and MAEM*

Kern is a small, independent California oil refining company which produces and sells certain "environmentally superior" products. (Kornicks Affidavit ¶¶ 3–4). As a result of the volatile energy market in 2000, Kern determined to construct an electric cogeneration facility to protect itself against future substantial fluctuations in energy prices. (*Id.* ¶ 5). In order to power this facility, Kern required an assured supply of natural gas at an affordable price.

The Mirant Entities (as hereafter defined) are in the business of producing, marketing and trading various energy products. MAEM is the subsidiary of Mirant through which trading and supply of such products, including natural gas, have been carried out. It was to MAEM that Kern turned to secure its natural gas supply for its cogeneration facility. Consequently, Kern and MAEM in February, 2002, entered into a Gas Master Service Agreement (the "GMSA") and a Transaction Agreement (the "TA"), both with terms running from January 1, 2003, to December 31, 2005, pursuant to which MAEM was to supply to Kern through the Southern California Gas Company ("SoCal") 50,000 MMBtu of gas at a fixed price of $3.951/MMBtu.[5]

MAEM and Kern's previous dealings included supply to Kern by MAEM of natural gas. In August of 2001, MAEM and Kern entered into a Master Monthly Netting, Close–Out Netting and Margin Agreement (the "Netting Agreement" and with the GMSA and the TA, the "Agreements"). (*Id.* ¶ 7). The Netting Agreement provided it would apply "to certain obligations arising out of all existing and future agreements between [MAEM and Kern] relative to the sale, purchase, or exchange of Commodities."[6] (*See* Netting Agreement, pmbl. *See also* ¶ 14.) The Netting Agreement was effective for one year, *i.e.,* through August 21, 2002, and thereafter evergreen, terminable on 30

---

4. 11 U.S.C. § 101 *et seq.* (hereafter the "Code").

5. Under the TA, MAEM was to provide to Kern all the gas Kern required. If Kern needed more than 50,000 MMBtus of gas during a given month, Kern would be charged a price tied to market for the excess. Though Kern's gas requirements during the life of the TA never were less in a given month than 50,000 MMBtu, such a difference would have resulted in a similarly calculated price adjustment. *See* TA, "Special Conditions."

6. "Commodity" is defined for purposes of the Netting Agreement as "natural gas only." *See* Netting Agreement ¶ 1(a).

days' notice. *See* Netting Agreement ¶ 12. Paragraph 11 of the Netting Agreement states that "a Contract, as defined in this [Netting] Agreement, shall constitute a 'forward contract' within the meaning of the United States Bankruptcy Code." "Contract" is defined as "any verbal or written agreement that pertains to the sale, purchase or exchange" of natural gas. *See* Netting Agreement ¶ 1(b). The Netting Agreement includes an *ipso facto* default provision of the kind referred to in section 365(e)(2)(A)(i) of the Code. *See* Netting Agreement ¶ 3.

Neither the TA nor the GMSA makes reference to the Netting Agreement. The TA does, however, incorporate by its terms the GMSA. As reflected in the Summary Judgment Evidence, the Agreements were the only operative contract between MAEM and Kern in the period leading up to MAEM's chapter 11 filing. The function of the Netting Agreement—which was designed to allow parties to net out reciprocal transactions—was thus limited. MAEM supplied Kern with natural gas to be used in Kern's cogeneration facility which Kern then paid for as contemplated by the TA and the GMSA.

## B. *Postpetition Events*

On July 14 and 15, 2003, Mirant and 74 of its direct and indirect subsidiaries, including MAEM, filed chapter 11 petitions in this court.[7] On July 14, MAEM requested and was granted an emergency hearing on its Motion for Interim Order Authorizing the Debtors to (i) Comply With Terms of Prepetition Trading Contracts, (ii) Enter Into Postpetition Trading Contracts in the Ordinary Course of Business, (iii) Provide Credit Support Relating to Both Pre– and Post–Petition Trading Contracts, and (iv)[sic] Setting a Final Hearing to Consider the Entry of a Final Order Affirming the Interim Order and Authorizing Assumption of Prepetition Trading Contracts (the "Trading Motion"). By the Trading Motion, MAEM asked that the court authorize certain protections for parties to transactions with MAEM that were entitled to the benefits of sections 362(b)(6) and 556 or 560 of the Code.[8]

---

7. A number of Mirant's subsidiaries have filed chapter 11 petitions since July 15, 2003. "Debtors," as used below, includes all Mirant Entities in chapter 11. "Mirant Entities" includes Mirant and all its subsidiaries, whether or not in chapter 11.

8. Section 362(b)(6) provides:
 (b) The filing of a petition under ... this title ... does not operate as a stay—
 (6) under subsection (a) of this section, of the *setoff* by a *commodity* broker, forward contract merchant, stockbroker, financial institutions, or securities clearing agency of any mutual debt and claim under or in connection with commodity contracts, as defined in section 761 of this title, forward contracts, or securities contracts, as defined in section 741 of this title, that constitutes the setoff of a claim against the debtor for a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of

this title, arising out of commodity contracts, forward contracts, or securities contracts against cash, securities, or other property held by or due from such commodity broker, forward contract merchant, stockbroker, financial institutions, or securities clearing agency to margin, guarantee, secure, or settle commodity contracts, forward contracts, or securities contracts
Section 556 provides:
 The contractual right of a commodity broker or forward contract merchant to cause the liquidation of a commodity contract, as defined in section 761 of this title, or forward contract because of a condition of the kind specified in section 365(e)(1) of this title, and the right to a variation or maintenance margin payment received from a trustee with respect to open commodity contracts or forward contracts, shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or

Those provisions essentially allow persons dealing with a debtor in commodity contracts, forward contracts and similar instruments to enforce *ipso facto* default provisions contained in those contracts and liquidate their positions *vis-à-vis* the debtor notwithstanding section 362(a) (providing for automatic stay) and section 365(e)(1) (neutralizing *ipso facto* default provisions) of the Code.

Though the court understood from the Trading Motion and the hearing conducted on July 14 that MAEM sought only to protect persons who might invoke sections 362(b)(6), 556 or 560, and though the court intended to so limit the relief granted, the order entered by the court on July 15, 2003, (the "Interim Order") by its terms provides much broader coverage.[9] The Interim Order extended at least some protection to MAEM's counterparties in "master agreements, 'long-term confirmation agreements,' netting agreements, master netting agreements ... and any transaction thereunder...." Interim Order ¶ F.

Any counterparty (as defined in the Interim Order) that continued to deal with Debtors postpetition pursuant to a contract of the sort described in paragraph F was "deemed ... to have accepted the benefits and protections of [the] Interim Order," and to have "waived the contractual right to cause the liquidation of a ... forward contract." Interim Order ¶ 9. The waiver of rights, however, would "be deemed null and void and without further effect" if Debtors gave notice to the counterparty of Debtors' intent to reject the underlying contract. *Id.* The Interim Order also provided additional benefits and protections to "Assured Counterparties" and "Protected Counterparties," as therein defined.

On August 27, 2003, the Trading Motion and Interim Order came before the court for further consideration and a determination of whether the relief granted in the

---

by the order of a court in any proceeding under this title. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a clearing organization or contract market or in a resolution of the governing board thereof and a right, whether or not evidenced in writing, arising under common law, under law merchant or by reason of normal business practice.

Section 560 provides:

The exercise of any contractual right of any swap participant to cause the termination of a swap agreement because of a condition of the kind specified in section 365(e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with any swap agreement shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title. As used in this section, the term "contractual right" includes a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice.

9. Counsel for Debtors, at the April Hearing, attempted to assume responsibility for the overbreadth of the Interim Order, in that counsel was its principal drafter. However, the Interim Order was signed and entered by the court with full knowledge of the relief actually sought and with the intent of providing just that relief. In a number of places the court interlined the Interim Order. That the court was pressed for time or had insufficient opportunity to assess the Interim Order's scope as compared to relevant provisions of the Code does not excuse it from responsibility. Thus, while the court may now act to minimize the substantive harm caused and adjudicate this Adversary in accordance with its intent in granting relief on the Trading Motion, at least insofar as no party is thereby prejudiced, the court is not in a position to fault any party, including Kern, for a procedural wrong that resulted from such party's reasonable perception of the scope of relief granted by the court in the Interim Order.

Interim Order should be continued.[10] The notice of the August 27 hearing separately identified "Assured Parties" and "Protected Counterparties." Kern was not identified in the notice as such a party entitled to special protection, and, on August 14, Kern filed a limited objection to the Trading Motion, asking that it be made clear that Kern would continue to receive the protections afforded Counterparties under the Interim Order. On August 26, Debtors filed an "Omnibus Reply" to objections to the Trading Motion in which Debtors asserted that "the Kern contract is not a forward contract." Omnibus Reply ¶¶ 4 and 19–20. Debtors, however, conceded Kern could argue it was entitled to the protections of the Interim Order. Following the hearing on August 27, the court entered an order (the "Final Order") on the Trading Motion. The Final Order provided that "[n]othing in [the Final Order] shall prevent any entity ... not treated by the Debtors as a counterparty from asserting that it is entitled to the protection or benefit of 11 U.S.C. § 362(b) or § 556...." Final Order ¶ 27.

The Final Order also included language intended to clarify the narrow scope of the contracts and counterparties entitled to the benefits and protections provided by it and the Interim Order:

> For the avoidance of doubt, Prepetition Trading Contracts [i.e., those contracts within the scope of the Final Order] include, and are limited to, only those contracts that, as of the Petition Date [sic] (i) are "forward contracts," "commodity contracts" and/or "swap agreements" as such terms are defined in sections [sic] 101 or 761 of the Bankruptcy Code; and (ii) had [sic] the con-

tractual right to cause liquidation or termination under sections [sic] 556 or 560 of the Bankruptcy Code because of a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code.

Final Order ¶ F.

This clarifying language, though awkward, was intended to resolve the ambiguity of the extent of the relief provided by the Interim Order. As previously stated, the Interim Order and Final Order were never meant by the court to grant benefits or protection to entities not entitled to invoke sections 362(b)(6), and 556 or 560 of the Code. The purpose of both orders was to provide to those who might otherwise lawfully terminate their relationships with Debtors (1) assurance of continued performance by Debtors and (2) incentive to continue to do business with Debtors.

Following commencement of its chapter 11 case, MAEM continued to supply natural gas to Kern pursuant to the TA. *See* Kornicks Affidavit ¶¶ 13–15; Hogan Affidavit ¶¶ 5–11. During the period from MAEM's filing until the end of November 2003, the market price of natural gas exceeded the price of $3.951 per MMBtu established in the TA. In accordance with the TA, for each of July, August and September, MAEM billed Kern (1) $3.951 per MMBtu for the first 50,000 MMBtu delivered and (2) at a price based on market for the excess. Kornicks Affidavit ¶¶ 13 and 15.[11] Kern paid the invoices for July and August in the ordinary course of business and on October 24 wired a September payment to MAEM.

MAEM also continued to supply natural gas to Kern in October. However, on October 23, 2003, MAEM filed a motion to

---

10. On July 15, 2003, the court entered an order supplementing the Interim Order. The July 15 order does not affect the dispute now before the court.

11. Kern's natural gas usage exceeded 50,000 MMBtu per month during all times relevant to the Adversary.

reject the Agreements and, on October 24, 2003, MAEM gave Kern notice that MAEM intended to reject the Agreements. Kornicks Affidavit ¶ 14. On October 29, Kern filed an objection in response to MAEM's rejection motion and gave notice to MAEM that it was "liquidating" the Agreements in accordance with section 556 of the Code. Hogan Affidavit ¶ 9.

On October 27, prior to Kern's notification to MAEM, Kern acted to reverse the September payment wired to MAEM in the amount of $294,612.00. Hogan Affidavit ¶ 7. Because the payment had been wired on October 24, the $294,612.00 was already in MAEM's bank account and MAEM's account was debited to Kern's credit in that amount. *Id.;* Exhibit B to Hogan Affidavit. The Summary Judgment Evidence does not show how or specifically by whose act MAEM's account was debited. On November 19, the court authorized rejection of the Agreements.

By agreement of the parties, the order authorizing rejection preserved Kern's and MAEM's rights to argue their positions in all respects.

Notwithstanding rejection of the Agreements or Kern's October 27 decision to "liquidate" its position, Kern continued to receive natural gas on MAEM's account through November 2003. On the basis that Kern was entitled to offset amounts otherwise due MAEM against damages Kern would suffer by reason of MAEM's nonperformance of the balance of the TA (by reason of the difference between the market price of natural gas and that stipulated in the TA), Kern not only reversed the October 24 payment to MAEM but refused to pay for natural gas received in October and November. Finally, MAEM incurred various charges from SoCal for balancing services [12] in connection with supply of natural gas to Kern.

---

**12.** MAEM ceased delivery of gas to Kern's account through SoCal on November 15, 2003. Hogan Affidavit ¶ 11. SoCal did not close Kern's account until December 1, 2003, during which time Kern continued to burn gas. *Id.* Pursuant to SoCal Schedule No. G IMB (Exhibit D to Hogan Affidavit; also available at <http://www.socalgas.com/regulatory/tariffs/tm2/pdf/G-IMB.pdf> (last visited May 12, 2004)), SoCal charges fees for cumulative negative (Standby Procurement Charge) or positive (Buy–Back Rate) transportation balances exceeding a 10% tolerance band. SoCal charged MAEM a Standby Procurement Charge because MAEM ceased supply of gas on November 15, even though Kern continued to burn gas thereafter, which resulted in a cumulative negative transportation balance for which MAEM became liable.

The quantity of gas component of the Standby Procurement Charge is calculated as confirmed transportation deliveries less actual usage. For example, if MAEM had a confirmed transportation delivery of 5,000 MMbtu of gas to Kern's account during a month and Kern used 8,000 MMbtu of gas that month, MAEM would incur a Standby Procurement Charge for the additional 3,000 MMbtu of gas that SoCal supplied to Kern.

The dollar component of the Standby Procurement Charge is calculated as 150% of a gas price index over a certain period of time, plus a brokerage fee. For the 3,000 MMbtu of gas that SoCal supplied to Kern in the above example, assuming the index price was $10.00/MMbtu, SoCal would charge MAEM $45,000.00 (3,000 MMbtu × $15.00/MMbtu), plus the brokerage fee.

Every year, during the months of November through March, SoCal also requires its customers (here, MAEM) to deliver a minimum of 50% of burn during 5–day periods. Depending on inventory, the delivery percentage may increase to either 70% or 90% burn daily. If the amount delivered is outside the required parameters, SoCal charges for a Daily Balancing Standby Rate with a dollar component calculated at 150% of a daily index.

In January and February 2004, SoCal invoiced MAEM a total of $419,771.71 in balancing fees, comprised of both a Standby Procurement Charge and a Daily Balancing Standby Rate, for the gas Kern burned between November 15 and November 30, 2003. MAEM alleges that Kern had

## II. *The Adversary*

Plaintiff commenced the Adversary on January 27, 2004, by filing its complaint (the "Complaint") against Defendant. In the Complaint, Plaintiff seeks relief against Defendant principally on the basis that Defendant's actions in "liquidating" the Agreements violated the automatic stay of section 362(a) of the Code. Plaintiff alleges that "Kern's purported liquidation of the Agreements violated Code § 362(a)(1), (3) and (6)." Plaintiff further asserts that reversal of the October 24, 2003, payment for gas delivered in September 2003 should be declared a violation of section 362(a)(3) in that the payment, once in MAEM's bank account, was property of Plaintiff's estate. Plaintiff seeks a declaration that Defendant's set off of postpetition payables to MAEM against Kern's rejection damages was in violation of section 362(a)(3) as well.[13] For these stay violations, MAEM requests that the court impose sanctions. Finally, MAEM seeks money damages of $1,077,999.55, representing amounts due but not yet paid for natural gas delivered by MAEM to Kern since commencement of MAEM's chapter 11 case, and reimbursement of SoCal's imbalance charges.

On February 27, 2004, in response to the Complaint Defendant filed its Answer, Affirmative Defenses and Counterclaims of Defendant Kern Oil & Refining Company to Plaintiff's ·Complaint (the "Counterclaim"). Besides responding to the Com-

plaint, Defendant alleged that Plaintiff, on October 8, 2003, executed and delivered to it a contract for the sale of natural gas through July 2004 (the "2003 Contract"). *See* Counterclaim, p. 10. Defendant asks that the court determine that the Agreements constitute a forward contract as defined in section 101(25) of the Code and so Kern is entitled to the benefits and protections of sections 362(b)(6) and 556 of the Code. Defendant further asks the court to declare that the Agreements were within the ambit of the Final Order and that Defendant was entitled to liquidate the Agreements under section 556 of the Code. Defendant requests a determination that the offset of rejection damage against amounts due MAEM was protected by section 362(b)(6) of the Code. Finally, Defendant alleges in the Counterclaim breach by MAEM of the 2003 Contract and seeks an administrative claim for such breach.[14]

In its response to the Counterclaim, filed on March 18, 2004, Plaintiff states the 2003 Contract "was generated and sent as a result of a simple, back-office error." Mirant Americas Energy Marketing, L.P.'s Answer to Kern Oil & Refining Co.'s Counterclaims ¶ 7. Otherwise, MAEM responded by denying the validity of the positions taken by Kern in the Counterclaim.

In the Motion Plaintiff asks that the court grant partial summary judgment that (1) Defendant's termination of the

---

the "independent ability to nominate and procure gas" and thereby avoid the SoCal charges after it terminated the Agreements, though Kern did no do so, and is therefore liable to MAEM for the balancing charges. Motion ¶¶ 23–24.

13. Apparently, because Plaintiff takes the position that Defendant's rejection claim is prepetition in nature, Plaintiff does not argue that the offset violated section 362(a)(6).

14. Kern argued during the March Hearing that any claim arising as a result of a deficiency in satisfaction of its rejection claim following "liquidation" of the Agreements would be entitled to cost of administration priority. *See also* Kern Brief, p. 23. A related claim is Kern's argument that it is entitled to "recoup" its damages claim. Because of the court's ruling on the Motion and Cross MSJ, these arguments need not be addressed at this time.

Agreements violated the automatic stay of section 362(a); (2) the reversal of the payment into MAEM's bank account violated the stay; and (3) Defendant's offset of amounts due to MAEM violated the stay. Plaintiff also asks that the court grant Plaintiff a money judgment. Defendant, in the Kern Brief, asks that the court grant it partial summary judgment as to the "forward contract" characterization of the Agreements.

### III. Summary Judgment Standard

Summary judgment is proper when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Jenkins v. Chase Home Mortg. Corp.*, 81 F.3d 592, 595 (5th Cir.1996). Summary Judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate when conflicting inferences and interpretations may be drawn from the evidence. *Askanase v. Fatjo*, 130 F.3d 657, 665 (5th Cir.1997); *James v. Sadler*, 909 F.2d 834, 836–37 (5th Cir. 1990). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505.

In making its determination, the court must draw all justifiable inferences in favor of the nonmoving party. *Id.* at 255, 106 S.Ct. 2505. Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," the nonmovant must

come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact. FED. R.CIV.P. 56(e); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Assn*, 79 F.3d 1415 (5th Cir. 1996) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1993). To defeat a properly supported motion for summary judgment, the nonmovant must present more than a mere scintilla of evidence. *See Anderson*, 477 U.S. at 251, 106 S.Ct. 2505. Rather, the nonmovant must present sufficient evidence upon which a jury could reasonably find in the nonmovant's favor. *Recile*, 10 F.3d at 1097.

There has been no meaningful amount of discovery in the Adversary. There does not appear to be any dispute about the Agreements (though the validity of the 2003 Contract is disputed), and the parties largely agree on the sequence of events. The court is thus able at this time to dispose of a number of issues. As discussed below, however, complete resolution of this Adversary must await further development of evidence, at least concerning the 2003 Contract and Kern's business.

### IV. Issues

■ The court will consider the Motion and Cross MSJ by addressing the following questions:

A. Was the reversal of the transfer of funds into MAEM's bank account protected by section 556 of the Code and the Final Order and so not a violation of section 362(a)?

B. Pursuant to section 556 of the Code was Kern permitted to receive and retain without payment natural gas

purchased on MAEM's account following termination of the Agreements?

C. To what extent, if at all, have the Interim Order and the Final Order expanded to additional entities entitlement to the protections and benefits of sections 362(b)(6) and 556 of the Code?

D. Were the Agreements and Kern within the scope of sections 362(b)(6) and 556 of the Code?

## V. *Discussion*

A. Reversal of Deposit to MAEM's Bank Account

■ Subject to an exception that is not applicable to the case at bar, *compare Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (holding that bank's temporary administrative freeze did not constitute a offset and did not violate the automatic stay) *with Town of Hempstead Employees Fed. Credit Union v. Wicks (In re Wicks)*, 215 B.R. 316, 319–320 (E.D.N.Y.1997) (holding that credit union which placed an administrative hold on debtor's account but did not seek relief from the stay for four months violated the stay), exercise of control over a chapter 11 debtor's bank account generally violates the automatic stay. *See In re Mims*, 209 B.R. 746, 748–749 (Bankr. M.D.Fla.1997) (holding that creditor violated the automatic stay for not releasing funds frozen in debtor's bank account by creditor through prepetition writ of garnishment); *Moratzka v. Visa U.S.A. (In re Calstar, Inc.)*, 159 B.R. 247, 256 (Bankr.

D.Minn.1993) (holding that credit card processor violated automatic stay by charging back against reserve bank account to offset prepetition debts against post-petition credit card sales); *In re Meade*, 84 B.R. 106, 108 (Bankr.S.D.Ohio 1988) (holding that deposits held in a savings account in a debtor's name are property of the estate). Because reversal of the October 24 payment to MAEM involved an invasion of MAEM's bank account, there clearly was a stay violation unless that invasion was arguably permitted by reason of section 556 of the Code.[15]

Section 556 provides that the contractual right of a party:

> to cause the liquidation of a … forward contract [is not] stayed, avoided, or otherwise limited by operation of any provision of [title 11] … [T]he term 'contractual right' includes a rule set forth in a rule or by-law of a clearing organization or contract market or in a resolution of the governing board thereof and a right … arising under common law, under law merchant or by reason of normal business practice.

The court has found no provision in the Agreements or the SoCal Rules [16] that would allow invasion on behalf of Kern of MAEM's bank account. Defendant has pointed to no such provision or any right under common law or the law merchant that would justify retrieval of a payment credited to MAEM's account. The Kern Summary Judgment Evidence offers no suggestion that the debit of MAEM's account was "by reason of normal business practice." The court thus concludes that,

---

**15.** The court need not address the Interim Order or the Final Order to resolve this issue. If either order need be held to have apparently extended the scope of section 556, the extension applied to those contracts and counterparties covered; it did not enhance the protections provided.

**16.** For purposes of this memorandum opinion, the court assumes without deciding this SoCal is a "clearing organization."

for purposes of the Adversary, debit of MAEM's account constituted a violation of section 362(a)(3) of the Code and Plaintiff is entitled to declaratory relief to such effect. To such extent the Motion is GRANTED.

However, Plaintiff has *not* shown that Kern caused the debit to the account.[17] Kern, upon determination it would exercise whatever rights it might have to liquidate the Agreements, so far as the MAEM Summary Judgment Evidence shows, did no more than direct its bank to reverse the transaction. The court therefore is unable to conclude that it was *Kern* that violated the stay. Accordingly, the court's grant of judgment on this issue is limited to holding that the stay was violated by someone.[18]

**B. Post–Termination Deliveries of Natural Gas**

■ The Agreements were terminated either pursuant to court order following MAEM's rejection motion or by Kern's notice that it was terminating and liquidating the contract. If pursuant to its order, MAEM's obligations under the Agreements ceased and the relationship of the parties under the Agreements ended, at the latest, upon entry of the court's order. *See Thinking Machs. v. Mellon Fin. Servs. Corp. (In re Thinking Machs. Corp.)*, 67 F.3d 1021, 1025 (1st Cir.1995) (stating that rejection of a contract becomes effective upon entry of court order approving the rejection); *Data–Link Sys., Inc. v. Whitcomb & Keller Mortgage Co., Inc. (In re Whitcomb & Keller Mortgage Co.)*, 715 F.2d 375, 378 (7th Cir.1983) (stating that

the contract, which was in effect at the time debtor filed its petition, remained in effect until it was rejected). However, if Kern's termination was the operative event, because it turned on Kern's "right" to terminate upon MAEM's bankruptcy filing, the termination was effective immediately. Netting Agreement ¶ 3.[19]

■ In either case, deliveries of natural gas to Kern at some point ceased to be governed by the Agreements. Amounts due for such post-termination deliveries under no theory could be offset against Kern's rejection damages as part of liquidation of the Agreements. Neither could Kern recoup from amounts owed post-termination damages suffered from termination of the Agreements. Recoupment requires that the offset obligations arise from the same transaction. *See Herod v. Southwest Gas Corp. (In re Gasmark Ltd.)*, 193 F.3d 371, 374–75 (5th Cir.1999) (stating that identical parties engaged in similar transactions is not sufficient for a defendant to recoup; rather, the obligations must arise from the same integrated transaction); *U.S. Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re U.S. Abatement Corp.)*, 79 F.3d 393, 398 (5th Cir.1996) (stating that, in the context of bankruptcy, recoupment permits a creditor to offset a claim arising from the same transaction that gave rise to a debtor's claim against that creditor); *Holford v. Powers (In re Holford)*, 896 F.2d 176, 178 (5th Cir.1990) (stating that, unlike set off, which permits parties to offset claims against one another based on different transactions between the parties, recoupment allows parties to offset claims against

---

**17.** In the MAEM Brief and the MAEM Reply, Plaintiff admits it cannot explain how its account was debited.

**18.** If Kern was not the entity guilty of violating the automatic stay, however, the amount debited to MAEM's account may be recoverable from Kern under section 549(a) of the

Code. The Adversary does not plead section 549(a).

**19.** The parties have both tacitly accepted that the Agreements should be treated as a single contract; the court does so as well.

one another based on the same transaction). *See also* 5 COLLIER ON BANKRUPTCY ¶ 553.10[1] (15th ed. rev.2000). Once the Agreements were terminated, deliveries of natural gas obviously were not governed by them, and the obligation to pay for that gas did not arise from the same transaction as Kern's rejection damages.

 However, the court finds nothing in the MAEM Summary Judgment Evidence that would support the conclusion that Kern's acceptance of natural gas deliveries post-termination of the Agreements violated the automatic stay. Rather, Plaintiff is entitled to payment for natural gas delivered on its account to Kern following termination of the Agreements. The Motion may not be granted as to how much is owed, though. Not only is the court not yet able to determine, because of section 556 of the Code, as discussed below, whether termination was effective upon Kern's notice of liquidation (an earlier date) rather than upon entry of an order rejecting the Agreements (a later date). The court also lacks evidence concerning (or even a copy of) the 2003 Contract,[20] and therefore cannot measure (whether by the 2003 Contract or some other theory) what price Kern should pay for natural gas delivered post-termination. Thus, while the Motion will be GRANTED as to Defendant's liability, determination of the amount owed must be deferred until trial on the merits.

## C. The Interim Order and Final Order

On its face, the Interim Order appeared to extend its benefits and protections to any entity that was a counterparty to any master agreement, netting agreement "and any transactions thereunder." Interim Order ¶ F. The Netting Agreement and, consequently, the GMSA and TA clearly fall within the terms of paragraph F. The Final Order added limiting language which makes clear that only "forward contracts" as defined in section 101(25) of the Code were covered by its terms. However, the court is cognizant that the Final Order could still be read to allow a counterparty to a forward contract, which counterparty is not a "forward contract merchant" (see section 101(26) of the Code), to claim its benefits and protections. The Final Order, of course, is interlocutory, and Kern was certainly on notice that Debtors did not consider Kern a "Counterparty" as defined in the Final Order. Furthermore, paragraph 27 of the Final Order contemplated cases like that presented by the Adversary. At the latest by entry of the Final Order, Kern was fully aware that its situation might be beyond the shelter sought in the Trading Motion and intended by the court. Indeed, paragraph 27 of the Final Order was designed specifically in response to Kern and other entities objecting to the Trading Motion.

██ In any event, the court may correct one of its orders to conform to the court's intent. FED.R.CIV.P. 60(a), incorporated in FED. R. BANKR.P. 9024; 12 MOORE'S FEDERAL PRACTICE 3rd ¶ 60.11[1][c] (1998); 10 COLLIER ON BANKRUPTCY ¶ 9024.02 (15th ed. rev.2003). Correction of an order by the court may not alter the substantive rights of a party if the party has relied to its detriment on the order. *See, e.g., In re Tyler*, 285 B.R. 635, 641 (Bankr.W.D.Tex.

---

20. The court also does not know whether the 2003 Contract, if it bound the parties, survived termination of the Agreements. While termination through rejection might not affect the 2003 Contract, termination by Kern pursuant to ¶ 3 of the Netting Agreement would appear to terminate "all obligations arising under the Transactions ..." *See* Netting Agreement ¶ 3. The 2003 Contract (if binding on the parties at all) may or may not be a "Transaction." Netting Agreement ¶ 1.

2002) (order improperly discharged student loan of debtor; on motion court deemed excess discharge void under FED. R.CIV.P. 60(b) as opposed to 60(a)). Where a party is not prejudiced through detrimental good faith reliance on an order, the court may correct the order to give effect to the court's intent. MOORE'S ¶ 60.11[1][c]; *Forty Acre Corp. v. Fina Oil and Chemical,* No. 98–0028, 1998 WL 104683, *1, 1998 U.S. Dist. LEXIS 2809, at *6 (E.D.La. March 6, 1998) (discussing and assuming valid correction pursuant to Rule 60(a) of a court-approved stipulation concerning personal injury claims entered in a related case, which was modified to clarify that it did not extend claims bar date for personal injury claimants).

In the case at bar, Kern could reasonably have relied on the Interim Order. The court is not prepared to hold that Kern did not, in good faith, also rely on the Final Order, though Kern was on notice that Debtors' understanding of the Interim Order (and, by extension, the Final Order) was that Kern was *not protected* by the Final Order. On the facts before the court, therefore, it was not unreasonable for Plaintiff to urge that Kern's conduct exceeded justifiable reliance on the Final Order.

Nevertheless, the court believes enough ambiguity exists in the Final Order that Kern should not be prejudiced, unless it is shown Kern acted in bad faith in claiming coverage by that order.[21] That said, cure and enforcement of the Final Order in conformity with the court's intent at this juncture would only prejudice Kern if it resulted in imposition of sanctions for violation of the stay or award of prejudgment interest on amounts offset. Kern is not prejudiced to the extent that it is required to pay for natural gas that it received and would have paid for, notwithstanding Code §§ 362(b)(6) and 556, but for any effect the Final Order might have.[22]

The court now holds that the Final Order only protects forward contract merchants that are, in such capacity, counterparties to forward contracts with one or more of the Debtors. If Kern fits that description and acted in good faith, then Kern acted properly. If not, though Kern will remain liable for amounts improperly offset or not paid, unless it is not shown to have acted in bad faith, Kern will not be subject therefor to (1) sanction or (2) interest for any time prior to the partial judgment entered pursuant to this memorandum opinion. As to Plaintiff's request for the imposition of sanctions, the Motion is therefore DENIED.

D. Scope of sections 362(b)(6) and 556 of the Code

■ Before turning to the key issue respecting Kern's offset against its rejection damages of amounts due to MAEM for pre-termination delivery of natural gas, *i.e.,* whether the Agreements were a forward contract to which Kern was a party as a forward contract merchant, the court must dispose of three arguments Plaintiff

---

21. Other parties that might have asserted the arguable ambiguity of the Final Order have not done so. *See, e.g., In re Mirant Corp.,* 303 B.R. 319 (Bankr.N.D.Tex.2003).

22. Kern's situation is potentially similar to that of "critical vendors" in *In re Kmart Corp.,* 359 F.3d 866 (7th Cir.2004). In that case "critical vendors" were paid by court order. In response to the argument that "[m]oney had changed hands," the Court said, "If the orders in question are invalid, then the critical vendors have received preferences that Kmart is entitled to recoup . . . ." 359 F.3d at 869. The Court went on to note that some provisions of the Code "forbid revision of transactions completed under judicial auspices," but the orders in question were *not* in that category. *Id.* The same is true of this court's interlocutory Final Order.

makes which could, if valid, obviate that inquiry. Plaintiff argues, first, that, even if Defendant was covered by the Final Order, any offset would require relief from the automatic stay, because the Final Order could only have preserved Defendant's rights under section 556 (as opposed to section 362(b)(6)) of the Code. Plaintiff's argument turns on Defendant *clearly not being a Protected Counterparty* as opposed to merely a Counterparty. Plaintiff points to Final Order ¶ 15, which reads, in pertinent part, "Solely with respect to Protected Counterparties, the automatic stay provisions of section 362 of the ... Code are hereby vacated and modified ... to allow ... enforcement of remedies by any Protected Counterparty." Because offset by Kern could only occur pursuant to section 362(b)(6), not section 556, and Kern "waived" its rights under section 362(b)(6) of the Code by continuing to trade with MAEM following entry of the Interim Order, Plaintiff reasons relief from the stay was a necessary prerequisite to any offset.

Plaintiff, however, overlooks Final Order ¶ 27, which preserves for Counterparties the right to assert entitlement to the protection or benefit of section 362(b)(6) of the Code. Indeed, the court (and, the court assumed, Debtors) intended in the Final Order to preserve for counterparties continuing to do business with Debtors, without diminution,[23] the rights they had at the time Debtors' chapter 11 petitions were filed. To the extent the Final Order is unclear in this regard, the court again invokes FED. R. BANKR.P. 9024 and FED. R.CIV.P. 60(a) to correct it.

Second, Plaintiff insists that the offset by Kern is different than liquidation of the Agreements. This is really the same argument as the prior one, because it ignores the plain language of section 362(b)(6) of the Code, which excepts from the stay "the setoff by a ... forward contract merchant ... of any mutual debt and claim that constitutes the setoff of a claim against the debtor for a ... settlement payment against cash ... or other property due from such ... forward contract merchant."[24] Under paragraph 3 of the Netting Agreement, the court concludes Kern's offset of its claims arising from termination of the Agreements is a "settlement payment" within the broad definition of section 101(51A) of the Code. *See Williams v. Morgan Stanley Capital Group (In re Olympic Natural Gas Co.)*, 294 F.3d 737, 742 (5th Cir.2002); *See also Wolkowitz v. Shearson Lehman Bros.*, 136 F.3d 655 (9th Cir.1998) (broadly construing section 362(b)(6) as to offset by a stockbroker). While section 362(b)(6) of the Code is not sufficient basis for Kern to offset amounts due for post-termination delivery of gas or to invade MAEM's bank account, section 362(b)(6) does permit offset of sums due for gas delivered pre-termination against Kern's rejection claim *if* Kern was acting as a forward contract merchant and was bound to MAEM in a forward contract.

Finally, Plaintiff cites the court to its prior opinions in *In re Mirant* (hereafter "*Mirant*"), 303 B.R. 319 (Bankr.N.D.Tex. 2003 *app. pending*) and *Chesnut v. Brown (In re Chesnut)* (hereafter "*Chesnut*"), 300 B.R. 880 (Bankr.N.D.Tex.2003 *app. pend-*

---

**23.** Nor did the court intend enhancement of rights of Counterparties except as specified for "Protected Counterparties."

**24.** Plaintiff also urges that the "rejection claim" of Kern relates back to the petition date, (*See* § 365(g)(1) of the Code) and so is not in mutuality with MAEM's postpetition

invoices. This argument, however, is also inconsistent with the intent of the Final Order—that, upon Debtors' rejection, a Counterparty could do what it would have been able to do had it terminated its relationship with Debtors at the time of the chapter 11 filings.

*ing*), arguing that, under these decisions, Kern should have sought relief from the automatic stay before acting. Plaintiff insists that Kern's posture was no different than that of the Bonneville Power Authority (the "BPA") in *Mirant*. As the court held the BPA should have sought relief from the stay before terminating its contract with MAEM, so, Plaintiff reasons, the court should also hold respecting Kern.

Plaintiff misreads the court's prior decisions. *Mirant* adopted the ruling in *Chesnut* that a party could not exercise self-help remedies in derogation of the automatic stay. *Chesnut* did not involve an exception to the stay such as that provided in section 362(b)(6). In *Mirant*, the court determined that the BPA, being a government unit, could not be a forward contract merchant, *Mirant*, 303 B.R. at 326–7, and was not entitled to invoke section 362(b)(6) to liquidate its contract with MAEM. The BPA argued, alternatively, that the Anti–Assignment Act, 41 U.S.C. § 15, was "applicable law" that allowed the BPA to enforce an *ipso facto* clause against MAEM under Code § 365(e)(2)(A)(i), and, because the *ipso facto* clause was enforceable, the stay did not prevent termination of the parties' agreement. The court, however, held that (1) there was a significant division in authority as to whether the Anti–Assignment Act was "applicable law" within the meaning of Code § 365(e)(2)(A)(i); and (2) even if it was, the better authority mandated obtaining relief from the stay *before acting on the* ipso facto *clause*. *Mirant*, 303 B.R. at 327–8 (citing, *inter alia, In re Computer Communications*, 824 F.2d 725 (9th Cir.1987)).

The case at bar is not the same. Kern claims the status of a *forward contract merchant*, exercising its rights under a *forward contract*, a different argument from *invocation of an* ipso facto *clause*. Offset and termination of a forward con-tract, by a forward contract merchant, unlike the exercise of any right implied by section 365(e)(2)(A)(i), is specifically exempted from the automatic stay. *See* Code §§ 362(b)(6) and 556.

■ It is to the question of whether the Agreements constitute a forward contract and Kern a forward contract merchant that the court must now turn.

1. Forward Contract

The question of whether the Agreements constitute a forward contract depends on the definition of forward contract in section 101(25) of the Code:

"forward contract" means a contract (other than a commodity contract) for the purchase, sale, or transfer of a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into, including, but not limited to, a repurchase transaction, reverse repurchase transaction, consignment, lease, swap, hedge transaction, deposit, loan option, allocated transaction, unallocated transaction, or any combination thereof or option thereon.

■ Interpretation of a section of the Code must begin with the language of the provision itself. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (holding that in all statutory construction cases inquiry begins with the language of the statute itself and ceases if the language is unambiguous and the statutory scheme is coherent and consistent); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (explaining that analysis in any statutory construction case be-

gins and ends with the language of the statute when the statutory language provides a clear answer); *Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (concluding that where resolution of a question of law turns on a statute, courts must look first to the statutory language). If the meaning of the language is plain, the court must adopt that meaning unless to do so would lead to an absurd result. *See Lamie v. United States Trustee,* —— U.S. ——, ——, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004) (when the language of a statute is plain and does not lead to an absurd result, the sole function of the court is to enforce the statute according to its terms); *Union Bank v. Wolas,* 502 U.S. 151, 158, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991) (the fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to the statute's plain meaning); *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (where a statute's language is plain, the sole function of the courts is to enforce the statute according to its terms).

Reduced to its essence for purposes of this case, the definition of forward contract is "a contract (other than a commodity contract) for the purchase [or] sale ... of a commodity, as defined in section 761(8) ... or any similar good ... or interest which is presently or in the future becomes the subject of dealing in the forward contract trade ... with a maturity date more than two days after the date [of] the contract." Because natural gas is a "commodity"[25] and the Agreements "matured" more than two days after their execution,[26] the only qualifiers the court must consider are whether the Agreements are "other than a commodity contract" and how to interpret the clause "which is presently or in the future becomes the subject of dealing in the forward contract trade."

■ With regard to the second of these concerns, Plaintiff argues in the MAEM Brief and the MAEM Reply that the "which" clause modifies "a contract." The Supreme Court has twice examined similar grammatical constructions in the Code. Neither of those cases supports Plaintiff's position. In *Ron Pair,* 489 U.S. at 241–42, 109 S.Ct. 1026, the Court adopted a reading of section 506(b) that would call for the court to construe here the "which" clause as modifying only the word "interest." In *Lamie,* 124 S.Ct. at 1030–31, the Court adopted a construction

**25.** Section 101(25) of the Code refers to section 761(8) for the definition of a commodity. That provision in turn adopts the definition of "commodity" found in the Act. The Act is defined in section 761(1) as the Commodity Exchange Act. 7 U.S.C. § 1 *et seq.* Section 1(a)(4) of the Commodity Exchange Act defines "commodity" to include natural gas.

**26.** The term "maturity" suggests a single date. The court, however, is of the view that "maturity" means the due date for commencement of performance. BLACK'S LAW DICTIONARY defines "maturity date" (date of maturity) solely in terms of a promissory note. BLACK'S LAW DICTIONARY 400 (7th ed.1999). The leading treatises offer no better guidance as to the meaning of "maturity date." 2 COLLIER ON BANKRUPTCY ¶ 101.25 (15th ed. rev.

1996); 1 NORTON BANKRUPTCY LAW AND PRACTICE 2D § 9:26 (1994). However, the House Report respecting section 101(25) clearly contemplates a series of transactions, and, thus, provides to the court some support for the view that "maturity date" was not a trick term reducing the apparent scope of the definition. H.R.Rep. No. 101–484, p. 4 (1990), U.S.Code Cong. & Admin.News 1990, pp. 223, 226 ("[A] forward contract merchant often has a *series of forward contracts* with the same customer, which are set off and 'netted out.' Legislation was enacted in 1982 to permit a non-defaulting forward contract merchant to terminate and net out forward *contracts* when the other party files a bankruptcy petition.") (emphasis added).

of Code section 331 that would translate in this case to holding that the "which" clause modifies each noun commencing with "good" (or, possibly, "commodity") and continuing through "interest." The court therefore concludes that the "which" clause modifies the types goods and services exchanged in forward contracts rather than describing the contracts themselves.

As to the parenthetical, this court is bound by the decision of the Court of Appeals for the Fifth Circuit in *Olympic Gas*, 294 F.3d at 741, in which the court held that "commodity contract" as used in section 101(25) had the same meaning as that assigned in section 761(4). While it might be argued that the specific reference in the definition of forward contract to Code section 761(8) to describe "commodity" implies that the absence of a similar reference in the parenthetical to section 761(4) indicates a different meaning for "commodity contract" in section 101(25) than in cases governed by section 761 (commodity broker cases), the court cannot agree. Not only is this court bound by *Olympic Gas*, but the reference to section 761(8) was added by Congress in 1990 to clarify the meaning of "commodity" in section 101(25) after diverse holdings respecting its correct definition. Congress simply did not perceive the need to clarify similarly the term "commodity contracts."

Having disposed of the qualifying language in section 101(25), it is clear that the Agreements constitute a "forward contract." [27] Under the Agreements, MAEM agreed to sell to Kern a commodity, and the Agreements had a maturity more than two days after their execution. Thus, to the extent of determining that the Agreements are a forward contract, the Cross MSJ is GRANTED.

## 2. Forward Contract Merchant

■ Viewing the Agreements from a different angle will serve both to explain further the reason for giving the definition of "forward contract" a broadly inclusive interpretation and to open the court's inquiry into the meaning of the term "forward contract merchant." [28] If, hypothetically, it were Kern in bankruptcy, the issue would be whether MAEM could terminate the Agreements pursuant to sections 362(b)(6) and 556 of the Code. There can be little question that MAEM is a forward contract merchant (*see* allegations in the Trading Motion). If MAEM were acting as such in executing the Agreements, the only question on which turns whether MAEM could liquidate its position *vis-à-vis* Kern would be whether the Agreements constitute a forward contract.

By reading the definition of "forward contract" liberally, the issue of entitlement to the benefits and protections of section

---

**27.** Ma's affidavit is not consistent with the definition of "forward contract" adopted by the court. It may be that Ma's testimony will ultimately be relevant to the disposition of the Adversary, but the court must follow the meaning of the words chosen by Congress in construing statutory language. That Congress might frame a statutory definition in terms broader than those common in the market place is not surprising or unusual (e.g., the definition of "claim" in Code § 101(5) is broader than the ordinary definition; see, similarly, the definition of "transfer," § 101(54)).

**28.** See Code § 101(26). Section 101(26) states:

"forward contract merchant" means a person whose business consists in whole or in part of entering into forward contracts as or with merchants in a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade.

362(b)(6) and 556 principally depends on whether the party invoking those protections is acting as a forward contract merchant. Though the Plaintiff and Defendant have devoted more attention to whether the Agreements meet the test for a forward contract, the court's view that it is the term "forward contract merchant" that is here dispositive is consistent with the Congressional purpose behind provisions dealing with forward contracts, which was not to affect a class of transactions (*i.e.*, forward contracts), but rather was to protect certain persons (*i.e.*, those engaged in the forward contract trade) and the market in which they were participants.[29]

The question, then, is whether Kern, under the Agreements, is a forward contract merchant. Do sections 362(b)(6) and 556 of the Code extend to Kern as well as (potentially) MAEM? The key portion of the definition of forward contract merchant is "a person whose *business* consists in whole or in part of entering into forward contracts as or with a *merchant* ...." (emphasis supplied). The balance of the definition repeats the expansive scope of commodities found in the definition of "forward contract."

■■■ Use of the terms "business" and "merchant" is significant. Without references to "business" and "merchant," the definition of "forward contract merchant" could as easily have been "a person that enters into forward contracts." This is the interpretation Defendant suggests the court give Code section 101(26), *i.e.*, any

person that enters into forward contracts is a forward contract merchant. However, to adopt this construction would violate the judicial corollary to Occam's Razor: that each word in a statute has significance and must be given meaning in construing the statute. *See Walters v. Metropolitan Educ. Enters.*, 519 U.S. 202, 209, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) (interpreting the definition of employer in 42 U.S.C. § 2000e(b) in such a way as to give each word some operative effect); *Moskal v. United States*, 498 U.S. 103, 109, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (refusing to adopt a construction of 18 U.S.C. § 2314 that violates the established principle that a court should give meaning to every clause and word of a statute); *Marek v. Chesny*, 473 U.S. 1, 12, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985) (interpreting FED. R.CIV.P. 68 and 42 U.S.C. § 1988 in such a way to as to give meaning to each word in both); *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 978 (1st Cir.1997) (adopting interpretations of the terms "annul" and "terminate" in 11 U.S.C. 362(d) to give independent meaning to each).

Neither "merchant" nor "business" is defined in the Code, so the court must look elsewhere to determine the meaning of these words. Taking the word "merchant" first, a merchant is one that is not acting as either an end-user or a producer. Rather, a merchant is one that buys, sells or trades in a market. *See* BLACK'S LAW DICTIONARY 1001 (7th ed.1999). That Congress intended such a meaning for the

---

**29.** The House Report to the 1990 amendment to the definition of "forward contract" makes clear in the first line of its statement of purpose that the intention of the amendment was to ensure that the *"forward contract markets are not destabilized"* by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code." H.R. Rpt. 101–484, p. 1, U.S.Code Cong. & Admin.News

1990, p. 223 (emphasis added). The House Report also speaks in terms of forward contract merchants entering into series of transactions with individuals, businesses and other entities. *Id.*, p. 4. Thus, Congress's intention was to ensure stability in the market; through enactment of provisions that would protect its participants.

word in the Code is confirmed by its usage elsewhere. Thus, the definition of "foreign futures commission merchant" in Code section 761(12) encompasses entities involved "in soliciting or accepting orders for the purchase or sale of a foreign future . . . ." Because a "foreign future" will itself always be a contract, rather than the underlying goods, the foreign futures commission merchant will not be a producer or user but will rather participate in a contract trading market. *See,* similarly, section 761(14), defining "leverage transaction merchant."

■ As for the term "business," a business is something one engages in to generate a profit. *See Professional Ins. Agents v. Comm'r,* 726 F.2d 1097, 1102 (6th Cir.1984); *Louisiana Credit Union League v. United States,* 693 F.2d 525, 532 (5th Cir.1982); *Salerno v. Western Casualty & Surety Co.,* 336 F.2d 14, 19 (8th Cir.1964). *See also* BLACK'S LAW DICTIONARY 192 (7th ed.1999). From the use of the term "forward contract trade" in sections 101(25) and (26), as well as section 101(38) (*compare* "margin payment" in terms of forward contact trade *with* section 741(5) defining "margin payment" in terms of "securities trade" for purposes of subchapter III of chapter 7, dealing with stockbrokers, *and* section 761(15) defining margin payment in terms of "commodities trade" in the subchapter dealing with commodity brokers) and section 101(51A) (similarly defining "settlement payment;" *compare* Code § 741(8)), the court concludes that a forward contract merchant is a person that, in order to profit, engages in the forward contract trade as a merchant or with merchants.[30]

■ This construction gives effect to all parts of the definition of forward contract merchant. Adopting Defendant's position—that any person that, in connection with its business, enters into forward contracts is within the scope of Code section 101(26)—would not only give insufficient weight to the term "business" and fail to take into account the market-oriented (*i.e.,* merchant) nature of the protections provided forward contract merchants. It would also, as Plaintiff argues, lead to virtually every person that is a party to a contract for goods or services, *see* section 101(25),[31] being permitted to ignore the automatic stay and to enforce *ipso facto* clauses. Such a result, the virtual absorption of the executory contract rules found in section 365 of the Code by the exception carved out to protect the forward contract market, would be absurd. Statutes should be read, where possible, to avoid absurd results. *See Lamie,* —— U.S. at ——, 124 S.Ct. at 1030; *Nixon v. Mo. Mun. League,* —— U.S. ——, ——–——, 124 S.Ct. 1555, 1564–65, 158 L.Ed.2d 291 (2004) (refusing

---

**30.** Use of the word "business" in, *inter alia,* Code §§ 101(48) (definition of "securities clearing agency"), 101(53A) (definition of "stockbroker"), 761(14) (definition of "leverage transaction merchant") reinforces the court's conclusion concerning the meaning of to be given the word in section 101(26).

**31.** Indeed, the classic example of a forward contract hypothesizes a farmer selling his crop for a fixed price on a future date. *See, e.g.,* CAMPBELL R. HARVEY AND STEPHEN GRAY, GLOBAL FINANCIAL MANAGEMENT: FORWARD AND FUTURE CONTRACTS ¶ 4.3 (last modified Feb. 15, 1997) <http://www.duke.edu/charvey/Classes/ba350—1997/futures/lecture.htm>. It is most unlikely that congress intended to give to a farmer, in the ordinary case, the status of "forward contract merchant." For example, though sections 556 and 557 of the Code do not directly contradict each other, the tension between the provisions (*see, e.g.,* § 557(d)(1)(D)) suggest congress did not expect the protections afforded by each provision typically to overlap. Yet Defendant's construction of section 101(26) would automatically make many farmers "forward contract merchants."

to read a statute in a way that leads to an absurd result); *Armstrong Paint & Varnish Works v. Nu–Enamel Corp.*, 305 U.S. 315, 332–33, 59 S.Ct. 191, 83 L.Ed. 195 (1938) (observing that a long standing judicial function is to construe statutes so as to avoid absurd results).

This court's holding in this case is entirely consistent with that of the Court of Appeals in *Olympic Gas*. *Olympic Gas* involved a preference suit against Morgan Stanley Capital Group, Inc. ("MSCG") for payments made to MSCG by Olympic Gas within 90 days of its bankruptcy in satisfaction of contracts for the future delivery of natural gas—the debtor and MSCG had each engaged with the other in numerous such contracts as purchaser or seller.

MSCG claimed that payments to it could not be recovered because Code section 546(e) provides that "the trustee may not avoid a [preferential] transfer that is a . . . settlement payment . . . made by or to a . . . forward contract merchant. . . ." The Court of Appeals, looking to the language of section 546(e) (which makes no reference to *forward contracts*), stated the issue before it in terms of section 546(e) "whether [MSCG] is a forward contract merchant." *See Olympic Gas*, 294 F.3d at 740. However, the court can have had little doubt that MSCG often acted as a forward contract merchant.[32] Rather, the Court of Appeals had to determine whether, *in its transactions with the debtor*, MSCG was acting as a forward contract merchant.[33] Thus, the Court immediately restated the

**32.** The brief filed by MSCG in the Court of Appeals (included in the Kern Summary Judgment Evidence) makes it clear that MSCG was, in fact, a forward contract merchant engaged in the forward contract trade. For example, MSCG states in its brief

> MSCG's core business is engaging in financial transactions involving commodities, including natural gas, crude oil, precious metals, and electricity. These transactions include two categories: on-exchange futures transactions and off-exchange forward contracts.
>
> . . .
>
> As is typical of forward contract merchants, MSCG complements each forward contract it enters by buying or selling a complementary contract that is either an on-exchange future or another off-exchange forward. For example, on January 2, 1997, MSCG purchased from Olympic 5000 MMBTU (Million British Thermal Units) of natural gas to be delivered each day during February at $2.7975 per MMBTU. At the same time, MSCG sold 5000 MMBTU for February delivery on the New York Mercantile Exchange ("NYMEX") for $2.80 per MMBTU. These complementary trades locked in a quarter cent per MMBTU profit and protected MSCG against price fluctuations. If the market price of natural gas dropped, MSCG's loss on the forward trade

> with Olympic would be offset by its gain on the futures contract, and if the market price rose, its loss on the futures contract would be offset by its gain on the forward trade with Olympic. Hedging is thus a two-sided proposition, where each contract limits the hedging party's risk on the *other* contract. The strategy of arranging complementary contracts on a forward and future basis is at the heart of MSCG's hedging strategy. *Williams v. Morgan Stanley Capital Group, Inc. (In re Olympic Natural Gas Co.)*, 2001 WL 34121311 (5th Cir. Dec. 11, 2001) (citations omitted).

Moreover, the trustee in *Olympic Gas* admitted that MSCG acted as a forward contract merchant in at least some transaction. *See In re Olympic Natural Gas Co.*, 258 B.R. 161, 163–64 (Bankr.S.D.Tex.2001).

**33.** MSCG would *not* be eligible for protection as a forward contract merchant with respect to every contract it entered into. As a lessor—or, for that matter, a purchaser of coffee or energy for its own consumption or as a producer of those commodities—it ordinarily would not be a forward contract merchant, even if the contract as issue fit the definition in Code section 101(25). This is clear from the opinion of the bankruptcy court in *Olympic Gas:* "MSCG is not a natural gas producer or distributor." *Olympic Gas*, 258 B.R. at 163.

**570**

question before it as "whether [MSCG] entered into a 'forward contract *with the debtor*'" (emphasis supplied). The Court of Appeals decided MSCG was entitled to protection as a forward contract merchant only after determining that the transactions between MSCG and the debtor were forward contracts entered into by MSCG while conducting business in the commodities market. *See, Olympic Gas* at 294 F.3d at 741: "The commodities market is divided into only two categories (1) on exchange futures transactions; and (2) off-exchange forward contracts." This court construes the use of the term "commodities market" to refer to the market in which commodities are traded. *See* BLACK'S LAW DICTIONARY 982 (7th ed.1999) (definition of market includes "[a] securities or commodities exchange".).

Applying the court's conclusions concerning the meaning of forward contract merchant to the case at bar, in order for Kern to have been able to invoke properly sections 362(b)(6) and 556, Kern must have entered into the Agreements as a participant seeking profit in the forward contact trade.[34] Affording Defendant the benefit of all inferences which could be drawn from the Summary Judgment Evidence, the court is not able to determine whether or not Kern could meet this test. Accordingly, to the extent Plaintiff seeks relief as to any otherwise proper offset by Kern of amounts due MAEM against damages arising from rejection of the Agreements, the Motion is DENIED.

### VI. *Conclusion*

Except to the extent specifically stated above, the Motion and Cross MSJ are DENIED. Plaintiff is directed to prepare and within three days hereof submit to Defendant a form of partial judgment consistent with this opinion. Judgment satisfactory to the parties in form shall be submitted to the court within 10 days hereof. Should the parties be unable to agree on the form of judgment, each party may submit by such time a form of judgment to the court. Debtors are directed to prepare modifications, *nunc pro tunc*, to the Final Order to clarify it as set forth in this opinion.

34. That Kern was an end-user of the gas supplied pursuant to the Agreements does not require that the court conclude it is not a forward contract merchant. Producers and customers may engage in the forward contract trade and may do so (even with respect to contracts based on their own production or consumption) seeking a profit. The definition of "forward contract merchant" includes a person whose business is "in part" entering into forward contracts. Thus a person who is principally in another business but speculates in the forward contract trade is, for such purpose, a forward contract merchant.