**In re MIRANT CORPORATION, et al., Debtors.**

No. 03–46590.

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Sept. 1, 2004.

348

Michelle C. Campbell, White & Case, Los Angeles, CA, Paul B. Carberry, White and Case LLP, New York, NY, Judith Elkin, Lead Attorney, Mark Joseph Elmore, Robin Eric Phelan, Judith Elkin, Frances Anne Smith, Amy M. Walters, Haynes & Boone, Dallas, TX, Vincent R. Fitzpatrick, Jr., Felix Lopez, Thomas E. Lauria, Bryan A. Merryman, Maria K. Pum, White and Case LLP, Miami, FL, Ian T. Peck, John David Penn, Haynes and Boone, LLP, Jeff P. Prostok, Forshey and Prostok, Ft. Worth, TX, John H. Sturc, Gibson, Dunn and Crutcher, Lead Attorney, Washington, DC, for Debtors.

David W. Wiltenburg, Christopher K. Kiplok, Hughes Hubbard & Reed LLP, New York, NY, Robert A. Simon, Barlow Garsek & Simon, LLP, Fort Worth, TX, for MediaNews Group, Inc.

### *Memorandum Opinion*

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the court is Debtors' Motion for the Entry of an Order (i) Enforcing the Automatic Stay Prohibiting MediaNews Group, Inc. from Terminating its Swap Agreement with the Debtors, (ii) Holding MediaNews in Civil Contempt of the Automatic Stay, (iii) Assessing Sanctions, and (iv) Granting Related Relief (the "Motion"). The court tried the Motion over two days, July 20 and 21, 2004. At trial the court heard testimony from James Lodovic ("Lodovic"), president of MediaNews Group, Inc. ("MNG"), James McDougald ("McDougald"), treasurer of MNG, Thomas Fletcher ("Fletcher"), a trader employed by Mirant Corp. ("Mirant"), Cameron Bready ("Bready"), a vice president of Mirant and James Modlin ("Modlin"), a lawyer and partner at HUGHES HUBBARD & REED, L.L.P. The court also received into evidence a number of documents described as necessary below. Debtors and MNG have submitted memoranda of authorities for the court's consideration.

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334(a) and 157(b)(2)(G). This memorandum opinion comprises the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 and 9014.

## I. Background

The court can discern little dispute between the parties regarding the facts of this case. Their differences arise from opposing views concerning the meaning the court should assign to the facts.

Debtors' business is principally the production, purchase, sale and trading of energy products. Debtors conduct their trading and marketing activities through Mirant Americas Energy Marketing, L.P. ("MAEM"). Besides participating in the energy markets, MAEM has from time to time traded for profit various non-energy commodity derivatives including swap agreements.

In the course of that business, on March 17, 1998, MAEM and MNG entered into an International Swap Dealers Association Master Agreement (the "Swap Agreement") by which MAEM and MNG agreed to exchange quarterly cash flows for a period beginning May 1, 1998 and running through April, 2005 based on the pricing of 48.8 gram newsprint.[1] Under the Swap Agreement, MAEM effectively guaranteed MNG a fixed price for newsprint. In other words, if the market price for 48.8 gram newsprint in a given quarter was higher than the price fixed pursuant to the Swap Agreement Schedules, MAEM would be liable to MNG for the difference; if the fixed price exceeded market, MNG would pay MAEM. At all times pertinent to resolution of the Motion, MAEM was "in the money—" i.e., the market price of 48.8 gram newsprint was less than the fixed price established by the Swap Agreement.

The Swap Agreement provided for monthly determinations of market price using prices quoted in an industry publication. Payment by the "out-of-the-money" party was to occur quarterly, beginning in May, 1998.

On July 14, 2003, MAEM[2] filed for relief under chapter 11 of the Bankruptcy Code (the "Code").[3] On the same day, this court, on motion of Debtors, executed its Interim Order Authorizing the Debtors to (i) Comply with Terms of Pre-petition Trading Contracts, (ii) Enter into Post-petition Trading Contracts in the Ordinary Course of Business, (iii) Provide Credit Support Relating to Both Pre– and Post-petition Trading Contracts, and (iv)[sic] Setting a Final Hearing to Consider the Entry of a Final Order Affirming Interim Order and Authorizing Assumption of Pre-petition Trading Contracts (the "Interim Order"). By the Interim Order, Debtors hoped to be able to maintain their trading business, despite, *inter alia*, Code § 560,[4] which permits termination of a swap agreement pursuant to a clause of the kind

1. The Swap Agreement was entered into under MAEM's former name, Southern Company Energy Marketing L.P. In 2001, MAEM and others of Debtors were spun off by Southern Energy, Inc., and Debtors' names (including MAEM's) were changed.

2. 75 of Debtors, including MAEM, filed petitions commencing July 14 and continuing through July 15. Eight more of Debtors have since filed for relief.

3. 11 U.S.C. § 101 *et seq*.

4. Section 560 provides:
   The exercise of any contractual right of any swap participant to cause the termination of a swap agreement because of a condition of the kind specified in section 365(e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with any swap agreement shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title. As used in this section, the term "contractual right" includes a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice.

found in Code § 365(e)(1) [5] by a debtor's contract party upon the debtor's bankruptcy filing.

On July 15, 2003, MNG learned of Debtors' chapter 11 cases. MNG received notice, *inter alia,* through a telephone call to McDougald's voice mail, in which an employee of Debtors advised McDougald of a conference call in which the Interim Order and its benefits for contract parties would be explained. Presumably—and the court infers—MNG was advised by Debtors of entry of the Interim Order to discourage MNG from taking advantage of Code § 560.

On or about August 21, 2003, Lodovic asked McDougald to contact Debtors and offer to buy MNG out of the Swap Agreement for $1 million. Debtors rejected MNG's offer, noting that the Swap Agreement had remaining value of approximately $3 million.

On August 28, 2003 the court entered its order (the "Final Order" [6]) continuing the relief provided by the Interim Order. In late August, 2003, again at Lodovic's behest, McDougald contacted Debtors to arrange a telephone conference to discuss the Swap Agreement. On September 4, 2003, the telephone conference occurred. Several individuals representing Debtors and MNG, including Fletcher, McDougald and Modlin, participated in the call.

The call actually occurred in two parts. Debtors initially took the position that the Swap Agreement was not the type of contract covered by the Interim Order and the Final Order. After MNG pointed to provisions in the Interim Order and the Final Order dealing with swap agreements and Code § 560, the telephone conference was adjourned and then resumed. When the conference resumed, Debtors refused to acknowledge that MNG was a Counterparty, as that term is defined in the Final Order.

In large part because Debtors refused to agree that MNG was protected by the Final Order, following the conference call, MNG determined it would exercise its right under section 560 of the Code to terminate the Swap Agreement. On September 4, 2003, Lodovic sent a letter to MAEM advising of the termination, and on September 16, 2003 [7] Lodovic sent a second letter to MAEM by which he advised that MNG had calculated net amounts due to MAEM under the terminated Swap Agreement at $1,135,578.

## II. Discussion

It is Debtors' position that MNG's termination of the Swap Agreement violated the automatic stay of section 362(a) of the

---

**5.** Section 365(e)(1) states:

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

**6.** The court has since modified the Final Order to clarify the extent and application of protections it provides. *See Mirant Americas Energy Marketing, L.P. v. Kern Oil Refining Co. (In re Mirant Corp.),* 310 B.R. 548, 561–63 (Bankr.N.D.Tex.2004).

**7.** MNG did not make the quarterly payment due on September 8, 2003 to MAEM.

Code. Although sections 362(b)(17) [8] and 560 of the Code exempt from the automatic stay actions taken by a swap participant (defined in Code § 101(53C)) to terminate or settle a swap agreement (defined in Code § 101(53B)), Debtors argue that those provisions are applicable only if the swap participant is terminating and settling the swap agreement in response to a bankruptcy filing. As MNG waited seven weeks after MAEM's case was commenced before terminating the Swap Agreement, Debtors argue MNG was unable to take advantage of sections 362(b)(17) and 560.

Alternatively Debtors insist that MNG "waived" its termination rights by its ac-

tions between July 15, 2003 and September 4, 2003. Debtors point to MNG's $1 million settlement offer and McDougald's determination of newsprint prices for July and August as actions that would waive those rights, relying on ¶ 11 of the Interim Order and of the Final Order. Paragraph 11 of each of the two orders provides that a party to, *inter alia*, a swap agreement, by entering into transactions postpetition with Debtors, waives its rights to terminate the swap agreement under sections 362(b)(17) and 560.[9]

■ The court does not find merit in

---

8. Section 362(b)(17) provides that:

> (b) The filing of a petition ... does not operate as a stay—
> (17) under subsection (a) of this section, of the setoff by a swap participant, of any mutual debt and claim under or in connection with any swap agreement that constitutes the setoff of a claim against the debtor for any payment due from the debtor under or in connection with any swap agreement against any payment due to the debtor from the swap participant under or in connection with any swap agreement or against cash, securities, or other property of the debtor held by or due from such swap participant to guarantee, secure or settle any swap agreement ....

9. Paragraph 11 in each order states:

> 11. Except as may otherwise be set forth in a Prepetition Assurance Agreement or a Postpetition Assurance Agreement:
> a. any Counterparty that has entered or enters into new transactions postpetition under Prepetition Trading Contracts or Postpetition Trading Contracts knowingly with a Debtor on or after the second business day following written notice of the entry of the Interim Order is deemed to have accepted the benefits and protections of the Interim Order and this Final Order (the "Waiver Event"), but Waiver Event will not include accepting or making deliveries or payments en-

> tered into prepetition or liquidating or terminating the same;
> b. upon the occurrence of a Waiver Event, each Counterparty is deemed to have waived the contractual right to cause the liquidation of a commodity contract or forward contract as such terms are used in section 556 of the Bankruptcy Code or termination of a swap agreement as such terms are used in section 560 of the Bankruptcy Code, each because of a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code; provided, however, that such waiver as it relates to such Counterparty is deemed null and void and without further effect in the event that (i) a Debtor delivers written notice to a Counterparty of the Debtor's intent to reject a Prepetition Trading Contract pursuant to section 365 of the Bankruptcy Code (a "Rejection Notice"); (ii) the Debtor fails to meet any margin or collateral requirements or otherwise fails to make any payments pursuant to the terms of any Prepetition Trading Contract or Postpetition Trading Contract; or (iii) this ... Order is stayed, modified in a manner adverse to a Counterparty or vacated, or otherwise terminates and each of the events in clauses (i), (ii) and (iii) hereof will be deemed to be a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code ....

either of these arguments.[10] MNG quite reasonably thought it was protected as a Counterparty under the Interim Order. Only on September 4, 2003 did MNG learn Debtors contested its right to invoke the Interim Order (and the Final Order). When MNG learned it might not be a Counterparty (or would at least have to fight for the status), it determined that it should terminate the Swap Agreement *because of Debtors' chapter 11 cases*. Debtors urge that MNG's motives were economic: it would be cheaper for MNG to terminate than to continue the Swap Agreement, as MNG was "out of the money."[11] That may be so, but it would be inequitable to allow Debtors now to spring a trap on MNG. Having on July 15, Debtors' first day in chapter 11, given MNG good reason to believe it was covered by the Interim Order and then, on September 4, having refused to acknowledge that coverage, Debtors would be enjoying their cake and yet keeping it whole if the court were to hold that through the passage of time MNG lost its right under Code § 560 to terminate.

As to the "waiver events," the language of ¶ 11(a) of the Interim Order (and Final Order) is not broad enough to ensnare MNG. Even if it would be appropriate to impose on MNG the burdens of an order Debtors declined to agree applied to MNG, the court cannot find in any of MNG's actions conduct that could be construed as "enter[ing] into new transactions postpetition ... knowingly with a Debtor." MNG did no more than calculate its exposure under the Swap Agreement and offer a buy-out to MAEM. There is nothing in the record that would support a finding that either was a "waiver event." [12]

The court believes this case is controlled by its opinion in *Kern*. The court there determined that a party who reasonably relied on the Interim Order ought not to be penalized for that reliance. 310 B.R. at 562. *Kern* involved a counterparty to contracts with Debtors whose case for reliance on the Interim Order was much less compelling than MNG's.

In *Kern*, MAEM argued waiver as it does in the present case. There this court held (310 B.R. at 563):

**10.** Debtors also argue that MNG failed to seek the status of "Protected Counterparty," as that term is defined in the Interim Order and the Final Order. It is not clear to the court why MNG should bear the burden of seeking protection. Congress, in enacting sections 560 and related provisions, did not intend that its will would be frustrated by the courts creating barriers to the exercise by a debtor's contract parties of the rights so given them.

**11.** It is unclear to the court why Debtors chose to "play cute" with MNG. The Swap Agreement was profitable. No relationships other than the Swap Agreement appear to have existed between Debtors and MNG. Had Debtors simply been forthright in their dealings with MNG, the Swap Agreement would have been performed to its end. As it is, Debtors overplayed their hand, costing the MAEM estate approximately $2 million in profit.

**12.** The argument that MNG waived its contractual right to terminate under applicable state law is not persuasive. But for sections 362(b)(17) and 560, there would be no contractual right MNG could waive. Put another way, but for Code §§ 362(b)(17) and 560, the very provision Debtors claim MNG waived would be unenforceable under section 365(e). Congress might have provided broader rights (*e.g.*, as under section 70b of the former Bankruptcy Act, pursuant to which lease anti-assignment clauses were generally enforceable in bankruptcy). Thus, the contractual clause is an entitlement to termination under sections 362(b)(17) and 560. Waiver of one requires waiver of all and may occur, in this case, only in accordance with the court's orders.

[MAEM], however, overlooks Final Order ¶ 27, which preserves for Counterparties the right to assert entitlement to the protection or benefit [of an applicable exemption from the stay]. Indeed, the court ... intended in the Final Order to preserve for counterparties continuing to do business with Debtors, without diminution, the rights they had at the time Debtors' chapter 11 petitions were filed. (footnotes omitted).

The court believes this prior holding is equally applicable to the case at bar. MNG was clearly a "Counterparty." It reasonably relied on the Interim Order. Before committing any act (*e.g.*, making the quarterly payment in September 2003) that might be construed as a "waiver event," it invoked its rights under sections 362(b)(17) and 560.

Debtors' interpretation of events, this court's orders and the law is not only inconsistent with Congress's intent in enacting section 560 and similar sections;[13] it flies in the face of the purpose of the protections given to Debtors.

■ It has often been said that the automatic stay of section 362(a) is a shield for a debtor, not a sword to be used offensively.[14] As the court indicated in *Kern,* it did not intend that the Interim Order or the Final Order should be used as a weapon against Debtors' contract counterparties.

Yet, in the case at bar, Debtors appear to be attempting to use the automatic stay and this court's orders in a pincer attack on MNG. Even if MNG had technically violated the automatic stay, the court would not find it equitable to penalize MNG on these facts.

■ However, MNG did not violate the stay. It was a swap participant that was party to a swap agreement. By reason of MAEM's bankruptcy MNG invoked its rights under Code §§ 362(b)(17) and 560 to terminate the Swap Agreement. It did not waive those rights. Therefore MNG's actions were authorized under section 362(b)(17) and 560 of the Code and the orders entered by this court.

## III. Conclusion

For the foregoing reasons, the Motion must be, and is, DENIED. Any court costs shall be charged to Debtors. Counsel for Debtors shall prepare and submit to the court an order consistent with this opinion.

---

**13.** Debtors argue that the court must construe narrowly the statutory exceptions to the automatic stay. It is true that case law does not favor broad exceptions to the stay. *See Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 590 (9th Cir.1993); *In re Sutton,* 250 B.R. 771, 774 (Bankr.S.D.Fla.2000); *Lori v. Lori (In re Lori),* 241 B.R. 353, 354 (Bankr.M.D.Pa.1999). However, it is the *entitlement* to invoke an exception that must be narrowly construed. *See Kern,* 310 B.R. at 568; *Williams v. Morgan Stanley Capital Group Inc. (In re Olympic Natural Gas Co.),* 294 F.3d 737, 741–42 (5th Cir.2002). Once an entity qualifies for an exception to the stay, the court must ensure that entity receives the

benefits Congress intended. Here there is no question MNG was entitled to invoke the rights of a swap participant and terminate the Swap Agreement.

**14.** *Winters v. George Mason Bank,* 94 F.3d 130, 136 (4th Cir.1996); *McHenry v. Key Bank (In re McHenry),* 179 B.R. 165, 169 (9th Cir. BAP 1995); *In re Edgins,* 36 B.R. 480, 484 (9th Cir. BAP 1984); *Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co., Inc.,* 62 B.R. 723, 730 (S.D.N.Y.1986); *McAtee v. Florida Bar (In re McAtee),* 162 B.R. 574, 577 (Bankr. N.D.Fla.1993).